VINCENT VALLONE V. THE STATE.

No. 21011. Delivered May 29, 1940.
Rehearing Denied February 5, 1941.
Motion for Leave to File Second Motion for Rehearing Denied
(Without Written Opinion) February 19, 1941.

The opinion states the case.

*W. Ray Scruggs, R. F. Peden, John N. Snell, Sr.*, and *Kahn & Branch*, all of Houston, for appellant.

*Dan W. Jackson*, Criminal District Attorney, and *Allie L. Peyton* and *Tod Adams*, Assistant Criminal District Attorneys, all of Houston, and *Lloyd W. Davidson*, State's Attorney, of Austin, for the State.

KRUEGER, Judge.

The offense is murder. The punishment assessed is confinement in the penitentiary for life.

From the record before us, it appears that about 5:00 P. M. on August 29, 1939, the appellant shot and killed J. I. Thomas on the landing of the stairway leading to the Uptown Club and the 21 Club room on the same floor, located on Capital Avenue, in the block between Milam and Travis Streets in the City of Houston, Harris County, Texas. The record discloses that the deceased, Thomas, and Strelau made two visits to the 21 Club on the afternoon in question. On their first visit, they merely came to the first landing apparently looking for some one. They remained but a few minutes and then left. About 40 or 45 minutes later they returned to the 21 Club, and in a very short time the appellant, his son and two other parties brought the deceased and Strelau to the stairway and struck them. They hit Strelau so hard that he fell from the landing down the stairway to the floor. The deceased was also knocked down by Tony Vallone but he caught himself near the landing, held his hand over his head as if to ward off the blows when appellant drew his pistol and said, "Get back and let me kill the s-- of a b---;" and then immediately fired two shots at Thomas, one of which

entered his body about three and one-half inches below the collar bone and about two inches to the left of the mid-line of the breast and made its exit about the center of the right shoulder, passing through the body on a level line. The other bullet struck the deceased on the right side about the short ribs and burned the skin but did not enter.

Appellant testified that he arrived at his office in the 21 Club in the afternoon between 4:00 and 5:00 P. M.; that when he started to leave his office he noticed two men whom he had not theretofore seen, beating and kicking his son. He said to them,. "Don't do that; don't do that," and then ran back to the office, procured his pistol, returned to the scene of the trouble and again said to them, "Don't do that; stop that." Whereupon, the deceased said to his companion, "Grab that s-- of a b---- and we will kill them both." Appellant again said, "Don't do that"; whereupon the deceased reached for the bosom of his shirt and advanced towards appellant, which induced him to believe that the deceased was going to draw a gun, and he then shot the deceased. Appellant further testified that he noticed that Strelau had a razor in his hand which he put back in his pocket after the shooting; that he did not shoot the deceased to kill him but to keep the deceased from killing him and his son.

Walter H. McGrew testified that on the afternoon in question he had been to a show; that when he came out from the show he went into the building where the fatal difficulty occurred; that he saw three people on the landing, one of whom was lying down and the other two were kicking him; that he heard one of the two say, "Kill him; Kill him"; that about that time two shots were fired and he then left.

The appellant's son, Tony Vallone, testified that he was employed as doorman for the Club; that on the day in question he heard the buzzer-button located underneath the carpet of the stairway, and when he heard it, he went to see who was coming up. He noticed that it was Strelau and the deceased. He inquired of them if there. was anything he might do for them. They replied that they wanted to come into the club-room and gamble. He told them that he was sorry; that it was a private club and he could not admit them. They called him a s-- of a b--- and left. In a short time he heard the buzzer-button again and went to see who was coming up and discovered that it was Strelau and the deceased. He again told them that it was a private club and that he could not admit them. The deceased then said to Strelau, "Grab that yellow s-- of a b----, and let us beat him up," and the

fight began. During the fight he tripped and fell on the landing of the stairway; that when he fell he struck his head against the wall and they, Strelau and deceased, kicked him; that he then heard some one holler, "Don't do that; don't do that." He noticed that the deceased, Thomas, had something in the bosom of his shirt and when he reached for it the first shot was fired and he saw Thomas stagger. The second shot was fired immediately after the first one. He then heard appellant say, "Tony, I am sorry I had to do that; if I hadn't done it they would have killed us both." Much of the defendant's testimony related to what the deceased and Strelau did to appellant and his son. When the deceased was picked up he had no weapon on his person, nor was any discovered on the landing where he fell. All that was found on his person was a half-pint bottle of whisky and five or six packages of cigarettes.

By Bill of Exception Nos. 1 and 2 appellant complains of the testimony given by Ray Brewer, a bystander, who testified that after the shooting he passed within three of four feet of where Frank Douglas and some other persons were standing; that he heard Douglas, a bystander, say, "There goes the s-- of a b---- who shot him"; that the defendant continued to walk until he had reached a point five or six steps away, when he looked back at them and then went toward the garage but made no reply. Douglas also testified that he made the remark, to which testimony appellant objected to on the ground that it was a statement by a bystander; that it was prejudicial because it was not shown that the defendant heard the remark, etc. The record shows that the statement was made by Douglas immediately after the shots had been fired and that when the defendant had walked five or six steps from his victim he looked back at Douglas who had made the remark. Although appellant testified in his own behalf he did not deny having heard the statement. Douglas, Brewer and appellant were, at the time of the remark, in such close proximity to the scene of the killing and to each other as justified the court in admitting the testimony. If appellant heard the remark and made no denial, it was a tacit admission that he had fired the shot and was proper for the jury to consider on the question of who did the killing, inasmuch as the defendant had not at the time testified and admitted the killing. Under appellant's plea of not guilty the State was required to prove that he did the killing and this evidence was a circumstance tending to connect him with the homicide.

In the case of Powell v. State, 99 Texas Cr. R. 284, 269 S. W.

443, a question somewhat similar to the one here presented was before this Court, and the Court, speaking through Judge Hawkins, said:

"From the proximity of the parties the court concluded that the testimony was admissible, but instructed the jury at the time that unless they found from the evidence beyond a reasonable doubt that appellant heard the statement of deceased testified to by Mr. and Mrs. Hagan they would not consider it for any purpose."

In the instant case, no such charge was given, nor required because the appellant, subsequent to the admission of the testimony, took the witness-stand and admitted that he fired the shots which produced the death of the deceased. However, the court, by written instruction, withdrew said complaint of testimony from the jury after they had deliberated part of two days and one night. Appellant contends that the belated withdrawal did not remove the prejudicial effect thereof. We are not in accord with his contention. In our opinion, the testimony, under the circumstances disclosed by the record, was admissible. Appellant cites us to the case of Young v. State, 124 S. W. (2d) 144. In that case, the appellant and a woman were in a car with the windows up, some ten or twelve steps from the person who made the remark, "What is that fellow trying to do with that woman?" There was no evidence that under the circumstances shown to have existed there that appellant heard or might have heard what was said. Consequently, the evidence was not admissible; but here we have quite a different state of facts. Moreover, we think the statement complained of was a part of the res gestae. See Gilmore v. State, 241 S. W. 492, 91 Texas Cr. R. 31; Taylor v. State, 299 S. W. 554; Kinney v. State, 144 S. W. 257; Keeton v. State, 128 S. W. 404.

Bill of Exception No. 3 reflects the following occurrence: After Tony Vallone, son of the appellant, had testified that Strelau and the deceased had not been inside the club on the afternoon of the homicide and had not lost any money in a card game and that he did not take them one at a time, bring them out to the stairway and throw them out, he was asked by the District Attorney:

"And the reason of it was * * * didn't you find out, they only had a small amount of money, and didn't one of you say, These cheap s-- of a b---- don't have any money'; did that happen?"

The witness replied, "No, sir." To all of which appellant objected on the ground that unless the State had something to back it up the questions were prejudicial and without foundation. We are not in accord with him for several reasons: First, the question was asked on cross-examination; second, there was some basis for the question because the club was a quasi-public place according to the testimony. It was a place where people engaged in playing cards. The stairway was provided with a buzzer-button placed under the carpet and out of view of people who came there. The purpose of the buzzer was to notify those in the club that some one was coming. Just above the door was a looking-glass so constructed that one on the inside of the club room could see who was coming up the stairway. If the club was not operated contrary to the law, then why all of these attachments? Furthermore, after Strelau and the deceased were thrown out, one of them came back up to the stairway and said, "Lonnie, give us back something." Under the facts here related, we would not be justified in holding that the questions were asked without any basis therefor but with a view of prejudicing the minds of the jury against appellant. See Clements v. State, 153 S. W. 1137. The State, upon cross-examination, may ask such questions as might show a motive for the encounter on the intent of the accused. Article 1257a, P. C., provides:

"In all prosecutions for felonious homicide the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased," etc.

However, the asking of an improper question will not in any and all events require a reversal of a case when the answer thereto was in the negative. See Ard v. State, 101 Texas Cr. R. 545; Graham v. State, 55 (2d) 826; Sayles v. State, 275 S. W. 831.

Bill of Exception No. 4 shows that the District Attorney propounded to the witness Vallone the following question:

"Hadn't Thomas been into that place before, and had won some two thousand dollars?"

This question was answered in the negative.

Bill No. 5 shows that the witness was then asked:

"Isn't it a fact that when they * * * came in there * * * that day * * * they started to gamble and it was discovered that

between them they had only about eight or nine dollars, and weren't they bounced out one at a time and rolled down the steps?"

To which the witness replied, "No, sir; never was there; never saw the men before in my life." We think that what we have said in disposing of Bill No. 3 applies here and we see no need of further discussing the question. See Alexander v. State, 8 S. W. (2d) 176; Briggs v. State, 2 S. W. (2d) 238; Clements v. State, 153 S. W. 1137.

By Bill of Exceptions No. 6 appellant complains of the action of the trial court in overruling his motion for a new trial based on the ground that J. T. Carter, one of the jurors of the panel before whom appellant was tried, was not a freeholder or householder; that on his voir dire he was asked the question if he was a freeholder or householder and he replied in the affirmative; that appellant was not negligent in failing to discover it until after the trial. It does not appear that any probable injury resulted to defendant by reason of Carter's services as a juror. Carter at first stood for assessing appellant's punishment at twenty years but after considerable deliberation agreed with his fellow jurors to assess the penalty at confinement in the State penitentiary for life. Subsequently Carter made an affidavit in which he charged misconduct on the part of the jurors in their deliberations. This affidavit was attached to appellant's motion for a new trial and urged as a ground for a new trial. This question has been decided adversely to appellant's contention. See Leeper v. State, 14 S. W. 398; Squyres v. State, 242 S. W. 1024, and authorities there cited.

Appellant also complains because the trial court declined to grant him a new trial on the ground that the jury in their deliberation received other evidence than that admitted under the ruling of the court, viz: Juror Carter informed the jury that he knew by reputation that appellant was operating a gambling house or club; that one or more of the other jurors stated that the defendant had been accused of the murder of one Navarro. The State contested the averments in the motion. In support of his motion, appellant claims that he not only attached the affidavit of Carter thereto but that he called the juror to the witness stand, who gave testimony supporting the averments in the motion; that he then rested; that the State merely offered the affidavits of the other eleven jurors in support of its contest but did not offer to place any of said jurors on the stand to support the denial of the averments in appellant's motion,

notwithstanding they were all present in court. Appellant takes the position that the affidavits offered by the State did not overcome the showing which he made entitling him to a new trial.

Article 757, C. C. P. provides:

"The State may take issue with the defendant upon the truth of any cause set forth in the motion for a new trial; and, in such case, the judge shall hear evidence, by affidavit or otherwise, and determine the issue."

In our opinion, the trial court, under the article quoted above, could, in his discretion, decline to hear oral evidence. See Asher v. State, 102 Texas Cr. R. 162, 277 S. W. 1099; McBee v. State, 44 S. W. (2d) 699. The granting or the refusal to sustain a motion for a new trial ordinarily rests within the sound discretion of the trial court and unless it is made to appear that he abused his discretion this court would not be justified in reversing the judgment.

All other matters have been examined by us and are deemed to be without merit.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

In his motion for rehearing appellant urges with much earnestness that we were wrong in holding that bills of exception numbers three, four and five did not present reversible error.

The questions complained of in the said three bills are set out in our original opinion. It must be borne in mind that all the questions were answered in the negative. It was appellant's contention that the questions were asked with the purpose of prejudicing the jury against appellant; that the State had no evidence to substantiate the matters embraced in the question, and that they were unfounded. The record discloses that the Assistant District Attorney, Mr. Winborn, was conducting the cross examination and propounded the questions involved. The

reasons which prompted the questions became the subject of investigation on the hearing of the motion for new trial, and Mr. Winborn's evidence on the subject follows:

"I have read the defendant's amended motion for a new trial in this case, and have familiarized myself with it and particularly the points raised in paragraph four, five and six thereof, wherein the defendant contends that I was not acting in good faith in asking Tony Vallone, a witness for the defendant, and also the defendant, Vincent Vallone, certain questions regarding certain conduct of the deceased, Thomas, and his friend, Strelau, prior to the killing of Thomas, and further contending that those questions were asked for prejudicial reasons with no information at that time as a predicate for propounding such interrogatories.

"I remember questioning the witness for the defendant, one Tony Vallone, and also the defendant, Vincent Vallone. I recall asking those questions. I did not ask them for the purpose of creating prejudice in the minds of the jury. I asked those questions because I had reason to believe that it did happen, from the information gained in the investigation conducted by the District Attorney's office and myself independently.

"I make this statement. There were two questions in which I had the information. The defendant testified that after the shooting that one of the reasons he went back into the 21 Club was to have his son washed up. I had information that the son left there and went into a barber shop over by the old city hall and washed up, and I asked Tony that question and he admitted that was true.

"As to the defendant, Vincent Vallone, I had information that, not Strelau, but that the deceased had been in that place a short time prior to that day and had won a sum of money, around two thousand dollars or twenty-two hundred dollars, and I asked him that question, if he hadn't been up there before, and he answered in the negative, and I pursued it no further; I accepted his answer and went no further. I asked him no further questions about that. I was simply seeking that information from the defendant himself. When he told me 'No,' I didn't go any further.

"I did ask substantially the question, to which objection is raised in paragraph four of defendant's motion, "And the reason of it was, didn't you find out they only had a small amount of money, and didn't one of you say "these cheap son of a bitches

don't have any money"; didn't that happen?' I had information to the effect that that did happen.

"When I asked the question complained about in paragraph five of defendant's motion, 'Isn't it a fact that when they (meaning the deceased and Strelau) came in there (meaning said club) that day (meaning the time of the homicide) they started to gamble and it was discovered that between them they had only about eight or nine dollars, and weren't they bounced out one at a time and rolled down the steps?' I had information which I thought justified me in asking that, and I honestly believed it did happen.

"When I asked the defendant the question complained of in paragraph six of defendant's motion, 'And won some two thousand dollars,' I had information which I felt justified me in asking that.

"As to whether or not I could prove it or not, when I asked those questions, I was doubtful of being able to prove it under the rules of evidence. I had information that satisfied me that it did happen, but I was doubtful of being able to prove it; that is, have it in the shape that it would be admissible as evidence, and when I asked the defendant those questions I was assuming he would answer truthfully."

In view of the sworn testimony of Mr. Winborn to the contrary we would not be justified in assuming that the questions objected to were asked in bad faith or for an improper purpose. In discussing objections urged to questions propounded to the defendant this court said in Patterson v. State, 87 Texas Cr. R. 95, 221 S. W. 596:

"The questions which the appellant failed to answer in an affirmative way were not such as to bring them within the rule which condemns conduct on the part of the prosecution wherein it is sought to discredit the case of the accused and secure a verdict adverse to him by bringing before the jury damaging facts through irrelevant questions, or questions which obviously are not expected to elicit proof or lay a predicate for legitimate evidence. This rule is conducive to a fair administration of justice, and its violation has often been the subject of comment, and at times the cause for reversal. McIntosh v. State, 213 S. W. 659; Faulkner v. State, 80 Texas Cr. R. 341, 189 S. W. 1077; Henley v. State, 81 Texas Cr. R. 221, 195 S. W. 197. *The rule is not to be made use of, however, to abridge the right of legitimate cross examination.*" (Italics ours.)

Giving effect to the rule with the qualification in mind, and assuming under the circumstances stated that the questions were propounded in good faith based on information which led counsel for the State to believe the matters involved in the questions were true, suppose the witness had answered the questions in the affirmative. Certaintly the answers would not be subject to a motion to strike based on a claim that the questions were improperly framed, having been asked on cross examination. It seems equally sure then that a negative answer would have nothing to do with rendering the form of the questions improper.

In Fritts v. State, 119 Texas Cr. R. 412, 42 S. W. (2d) 609, where the death penalty was assessed, questions were asked accused on cross examination which were objected to, but were answered in the negative as here. We there said even if the questions had been improper a reversal would not necessarily follow, the questions having been answered in the negative, and quoted from Ard v. State, 101 Texas Cr. R. 545, 276 S. W. 263, as follows: "The asking of a question whose affirmative answer might be hurtful to the accused would ordinarily present no error when complained of in a bill of exceptions unless the answer is given, and, if given and answered in the negative, as is the case in appellant's bill of exceptions No. 5, no error would be made to appear."

See also Booth v. State, 90 Texas Cr. R. 240, 234 S. W. 888; McCoy v. State, 129 Texas Cr. R. 259, 86 S. W. (2d) 748. The holding in Ard's case (supra) was followed in Graham v. State, 122 Texas Cr. R. 416, 55 S. W. (2d) 826; McCoy v. State, 129 Texas Cr. R. 259, 86 S. W. (2d) 748.

In his motion for rehearing and written argument in support thereof appellant mentions Alexander v. State, 8 S. W. (2d) 176; Peysen v. State, 136 Texas Cr. R. 127, 124 S. W. (2d) 137; McClure v. State, 136 Texas Cr. R. 312, 124 S. W. (2d) 1007; Waters v. State, 91 Texas Cr. R. 592; 241 S. W. 496; Sumrow v. State, 116 Texas Cr. R. 593; 31 S. W. (2d) 823; McNaulty v. State, 138 Texas Cr. R. 317; 135 S. W. (2d) 987; Lamm v. State, 94 Texas Cr. R. 560, 252 S. W. 535; West v. State, 137 Texas Cr. R. 554, 132 S. W. (2d) 872; Bowers v. State, 138 Texas Cr. R. 98, 134 S. W. (2d) 675. It is not believed that such cases furnish much aid in considering the question before us in the present instance. Said cases furnish illustrations where questions to witnesses were put in such form as to inform the jury of specific crimes or misconduct of accused

which were collateral to and not connected with the offense upon trial, which facts were not properly provable. In the opinion on rehearing in the Waters case (supra) we find this language:

"The questions propounded by counsel for the state in the instant case were improper, and, even had they elicited affirmative responses, the evidence would have been inadmissible." Therein, we think, lies the vital distinction in the questions which are the subject of objections in the present case. If affirmative responses had been elicited the evidence would clearly have been admissible.

· Appellant relies strongly upon Ballard v. State, 97 Texas Cr. R. 455, 262 S. W. 85, to support his contention that bills three, four and five present reversible error, and from a casual reading it would seem to be more nearly in point than any other case to which our attention has been directed, and yet there is a marked distinction between it and the present case. Ballard killed Bates. The evidence showed that Bates was hunting Ballard with the avowed intention of killing him. Bailey was an employee of Ballard. Bailey had an extended conversation with Bates a short time before the killing in which he repeated the threats to kill Ballard. Bailey repeatedly declared that Bates declined to give a reason for wanting to kill Ballard. On cross examination the witness was asked the question "Don't you know Bates did tell you what he was going to kill Ballard for?" He again answered in the negative. He was then asked "Don't you know that Bates told you that he was going to kill Ballard on account of improper conduct of Ballard toward Bates' wife?" The court sustained objection to the question and it was not answered. In discussing the matter this court assumed,—in the absence from the record of a reason for the trial court's ruling—that under the circumstances the question was not asked with the expectation of an affirmative answer. In the present instance under the facts as heretofore related this court would not be justified in assuming that questions here the subject of objections were asked in bad faith. Again, since the reason for the trial court's ruling in Ballard's case was a matter of conjecture it might be that he thought appellant would in no event be bound by it even had Bailey answered the question in the affirmative, that is, that improper relations between Ballard and Mrs. Bates could not be thus proven and that the question sought to elicit inadmissible evidence. The reversal in Ballard's case did not rest alone upon the incident mentioned. The representative of the State in two

instances told the jury in his argument what he could have proven but had not. Suppose Ballard had been on the witness stand and State's counsel was in possession of information which led him to believe that improper relations had existed between Ballard and deceased's wife, and counsel on cross examination had asked Ballard if in fact such relations had not existed and if he (Ballard) did not know that this was the reason of Bates' anger and threats to kill. Under such circumstances what basis would there have been for a contention that the question was improper, regardless of the answer? If such had been the picture in Ballard's case then we would have a parallel here.

It occurs to us that to sustain appellant's contention here would destroy the very end sought to be attained by legitimate cross examination. If the defendant or any other witness is thought to be in possession of information which would be legitimate evidence if an admission as to such facts could be secured from him on cross examination, certainly it would not be improper to so frame the question as tended to secure the admission by an affirmative answer. Yet to hold as appellant contends would deter counsel from asking such a question, for fear of being penalized if a negative answer was given by the witness.

In our original opinion we said that after Strelau and the deceased were thrown out one of them came back up to the stairway and said, "Sonnie, give us back something." Our attention has been called to a typographical error. The name should have been "Lonnie," and the original opinion has been corrected to so read.

Believing the proper disposition was made of the case originally appellant's motion for rehearing is overruled.