ARLIN F. REESE V. THE STATE.

No. 21481.  Delivered May 7, 1941.
Rehearing Denied June 18, 1941.

256

258

The opinion states the case.

*Norton Fox* and *L. E. Eubanks,* both of Groesbeck, for appellant.

*L. L. Geren,* County Attorney, and *Clarence Ferguson* and *J. B. Engledow,* Assistant County Attorneys, all of Groesbeck, *Charles T. Banister,* Criminal District Attorney, of Corsicana, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State, on submission.

GRAVES, Judge.

Appellant received the penalty of death by the verdict of a jury for the murder of Lizzie Reinhart, and he appeals.

The facts reveal that appellant, a mature man, had been married, and his wife had been committed to a hospital for the insane, and at the time of this alleged tragedy he was then and had been for a few years living with the deceased as man and wife. They were looked upon as such by some of their neighbors. The deceased had borne appellant one son, twenty-two months old at the time of the woman's death, and she was again pregnant, and there was taken from her dead body by the physician a full formed eight and one-half pound baby boy. Appellant was employed in delivering newspapers over a certain route each day, and lived with Lizzie Reinhart and the child in a house in Limestone County.

The body of Lizzie Reinhart was found wrapped up in a quilt by the side of the road in some Johnson grass on August 30, 1940, in Navarro County. Decomposition had set in at such time, and upon the performance of an autopsy upon her body a bullet was found in her head, it having passed through the cranium, and by a Caesarian section the unborn child was

brought from her body. This body when found was clothed in a white nightgown, wrapped in a sheet and a blanket, and also a tacked comfort. There was a wound on the left side of her head, and the bullet was taken out at the right side of the head. It was a 22 calibre bullet.

It was claimed by the sheriff of Limestone County, Mr. Simmons, that upon a permission given him by appellant, on September 6, 1940, he went to appellant's home, on the road between Mexia and Tehuacana, and found some twine similar to twine found tied around the knees of the dead body, and also a mattress with two circles cut out of it, and the cotton in said circles was shown to have been removed, one place in said mattress being about a foot and a half across each way, and another circle near the above one, both cut, not torn, out of the mattress.

Mr. Robertson, a deputy sheriff, went out to appellant's home with the sheriff, and he found a 22 calibre pistol in a basket under some clothes in appellant's home. A State chemist found human blood in the home of appellant, and also blood on an automobile that was identified as that of the appellant. He also found blood in the cotton remaining in the mattress found in appellant's house.

There seemed to be some question as to the identity of the dead body, and four days after its burial it was exhumed and positively identified as that of Lizzie Reinhart.

There was also shown an insurance policy on the life of the deceased, taken out by appellant and payable to him upon the death of Elizabeth Reese, at the age of thirty-three years, taken out February 27, 1939.

The State introduced two confessions of appellant, both similar, but the latter one possibly going into more particulars of the alleged offense, and we set out the latter in its entirety: "The State of Texas, County of Limestone.

"I, Arlin F. Reese, being under arrest and charged with murder, and being warned by Clarence Ferguson that I do not have to make any statement at all, and that any statement I make may be used in evidence against me on my trial for the offense concerning which this confession is herein made, do

freely and without compulsion or persuasion make to the said Clarence Ferguson the following statement and confession:

"My name is Arlin F. Reese and I am 45 years old. I live in Limestone County out 3 miles west of Mexia, Texas. For about 3 years I have lived with Lizzie Reinhart. She was not my wife and I had never married her. I have a boy 22 months old by Lizzie Reinhart.

"On Wednesday morning, August 28, about 3 o'clock I got up and dressed and watered and fed my hogs and turned out some small chickens that I had fastened up. I came back in and got ready and left on the paper route as usual. I got through about 9:30 and came back home. The first thing that I done after I ate my food that morning was I helped peel and get ready a half bushel of pears. The rest of that day I did the usual things that are done around a place. Late that afternoon I went and got some ice. I went to bed about 9 o'clock Wednesday night.

"On or about 3 or 3:30 Thursday morning I got up and dressed and tended to everything as usual. Lizzie was awake at the time I got up and dressed. When I got through with tending to things outside, I came back in the house and Lizzie seemed to be asleep. I had been studying about leaving home on account of the condition that she was in and everything. I mean by this that I wasn't married. It popped in my mind then that I decided to murder her. Some day before then I had decided to do this. So that morning which was Thursday morning, August 29, 1940, between 4 and 5 o'clock I went over and unlocked my cedar chest and got that 22 target pistol, walked over to the vanity and got a shell off the top of it. I loaded the gun, walked through the dining room and kitchen into back screen in room through this room into her bedroom. I walked around to the side of the bed where she was laying and put the gun down about 6 or 8 inches of her left temple and fired the shot. She didn't move or speak a word afterwards. I then pulled the cover up over her head, pulled the shades down in her bedroom, got my baby and carried him out and put him in the back seat and went on my route as usual. This was the 22 months old baby.

"When I got off my route about 10 o'clock, I stopped over in Mexia for a little while and got home about 11 o'clock. I drove up by the side of my house in my car as usual, I got out and

walked around the place to see if everything was all right. Everything outside was all right. I did not go in the house. I went and got back in my car and came back through town and went down to my Aunt's house on the south side of town on South Bonham Street. My Aunt's name is Mrs. Mollie Thomas. I stayed there and talked to her generally something around 1 1/2 hours. I did not mention anything to her about that crime. Her husband was in the *from* bedroom asleep. He works at night. When I left Aunt Molly's I got in the car and come back through Mexia and went out the Groesbeck highway about a mile on this side of Forrest Glade schoolhouse. I turned off the highway and went toward the Reunion Ground to see John Pearson, a negro, *bout* some he owed me on a paper. He was gone from home at the time and I did not go on down to his house. Another negro told me that he was not at home. So then I went on toward the Reunion Grounds until I hit the Reunion Grounds road and turned back toward town and stopped at Jack Echols Store. I bought the baby soda water to drink. I stayed there about 15 or 20 minutes. It was getting around 4 o'clock at this time. I come back to Ballard Grocery and bought some cookies and candy and I think a bottle of milk. I stayed there in town until after night. I left and went back out home which was about 9 or 9:30 o'clock of Thursday, August 29, 1940.

"I drove in and parked the car by the side of the house, got out and since my baby was asleep I just left him in the back seat of the car. I tended to everything before I went and unlocked the door to go inside. I taken my flashlight and went through the rooms to see if anything was wrong in there. I stayed around there until about 10 or 10:30 and I went over to the bed where Lizzie was *lieing* on the bed, taken and rolled her up in the sheets and the comfort that was over her. It was a tacked comfort. I rolled her up in that comfort and I went and got the twine that was in a bucket in the back room, taken two pieces of twine and tied cover around the feet and head. I taken and loaded her in my two door 34 model Ford between the front and back seats in the floor. I went back and locked the doors, went out and got in my car and left.

"I crossed the overpass and went out East Milam until I hit Ross Avenue and turned north up Ross Avenue which intersect Highway 14. I went up highway 14 until I got to Richland. From Richland I went up highway 75 to the Y Club which is

about 3 miles south of Corsicana. There I turned off Highway 75 and went towards Highway 31. I went up to the Magnolia pump station. I hit the car line and turned east and went a couple of blocks north and then I hit the car line again and turned back the same route I had went in. About the time I got to the pump station a car was following me and I slowed down and this car passed me just before I got to Highway 31. This car that passed me pulled up into a little road and they seen a truck parked in this little road and they commenced backing out. And when I seen this car backing out I whipped around them and crossed the railroad and came on back the way I went in. In going back toward the Y Club I passed a coupe car with about 3 people in it. I drove on pass them up on a little rise in the road and stopped and killed my motor and put my lights out and got out of my car and walked across the highway just over to my left. About the time I got over the highway I heard some one walking. It was a drunk man, so I looked around and he was near my car and I commenced talking to him. He wanted a cigarette. He and I rolled and smoked a cigarette apiece. He wanted me to carry him home. After I had given him about 2 cigarettes he hiked on toward town. So I got in my car and started the motor and turned my lights on and another car passed me and drove on off the road and put my light out, about 250 yards from the Y Club. I got out and walked around the car and took this body out and laid it over by the side of the highway. I laid it on the west side of the highway. I got back in the car and headed toward home. I come back the same road that I went. I got home around 1 o'clock that night. The next day I cut the piece out of the mattress cover that was blood stained and burned it.

"I was arrested by officer Luther Simmons, Marvin Wooton, Jess Bozeman and Leonard Wilson on the night of Sept. 3rd, 1940. The 22 target pistol No. 17834 was the gun that I killed Lizzie Rheinhardt on August 29, 1940.

"When I got in the night I disposed of the body I think it was about 1 or 1:30 o'clock. I fixed the bed and went to bed.

"I have followed my usual course of business until I was arrested.

"Witness my hand this 4th day of September, 1940.

Arlin F. Reese.

"WITNESSES:

"L. S. Simmons, Dr. Stanley Cox, Leonard Wilson."

The witness Ellett, who lived near appellant, saw the deceased alive on Tuesday or Wednesday on the week of her death. She was pregnant with child. He then again saw appellant at witness' home on September 1st, Sunday afternoon. Appellant was at his house, and when asked as to the whereabouts of the deceased, appellant said "She was at her brother's." This was the same woman whose body was exhumed on September 6th, so witness said.

Appellant offered but one defense, and that was the defense of insanity. He also introduced numerous character witnesses who testified as to his good reputation as a peaceable law-abiding person, the major portion of said witnesses basing their testimony on their knowledge of him some fifteen or twenty years prior to the commission of this alleged offense. Appellant did not take the witness stand, but brings forward in the record 53 bills of exceptions.

Bill No. 1 relates to a failure of the court to grant a motion for a peremptory instruction to the jury on the facts. This should not have been given.

Bill No. 2 relates to a motion for a continuance in order to obtain the attendance of one Fred Reese, a brother of appellant. It was stated in the motion that the residence of this witness was unknown, and that appellant had inquired of his sister, relatives and friends as to the whereabouts of this brother, and was unable to locate him. That the facts that appellant expected to prove by this brother were that "he knows the physical and mental condition of said defendant. That he knew that said defendant had some kind of spells at different times which spells affected his mental faculties at the time being." It appears that no subpoena had ever been issued for such witness.

It is to be noted that the State, in controverting the above motion, showed that Fred Reese had been absent from the County of Limestone for many years; that he was last reported as a day laborer in the State of California, who moved from place to place; that he had also been reported to have been residing in a foreign country, and that there were other witnesses by whom the appellant could prove the same thing as he desired to prove by Fred Reese.

We observe that the facts alleged to be those which were expected to be proven by the witness were that he, appellant, had spells at times, and that these spells affected him mentally. To what extent such affection went is not alleged, and unless such spells were of sufficient gravity to have caused a condition that would have destroyed reason and the knowledge of right and wrong, then we think that such would not have "appeared to the court as material," as is prescribed in Art. 541, sub. 3, C. C. P. It is also worthy of note that no subpoena had ever been issued for this witness, evidently on account of the fact that his residence was alleged to be unknown; but it is also noted that Fred Reese's sister, as well as his brother, his relatives and his friends all seemed to have been without any knowledge of the witness' whereabouts, and a continuance granted for the purpose of procuring the attendance of this witness to testify to these nebulous facts would have been useless, and could have only operated as a means of delaying this trial. The motion for a new trial was heard and overruled nineteen days after the verdict herein was rendered, and we note that no further mention was made relative to this motion, nor the desired witness. In the case of Aston v. State, 48 S. W. (2d) 294, Judge Christian, whose recent death we so greatly deplore, wrote as follows:

"The residence of the witness Garland was unknown at the time of the trial, and we fail to discern upon what facts a reasonable expectation of procuring his testimony at a subsequent term could be based. As heretofore stated, it was averred that the witness formerly resided near McAlester, Okl. It was not shown when he left the place of his residence. It was further averred that the last time appellant had seen the witness he resided in Seminole county, Okl., but that he had since changed his residence to either Oklahoma county, Okl., or some of the counties in the East Texas oil fields. It was not shown in the application when the witness left the state of Oklahoma. It was alleged in the application that appellant had been advised by relatives of the witness since the return of the indictment that the witness had gone to the East Texas oil fields to work, but that they did not know to what county. As heretofore shown, it was averred that the witness was an oil field worker. He was evidently a transient person. Although appellant should have known the counties comprising the East Texas oil fields, he made no application for process to any of said counties. Notwithstanding he averred in his application that he had been making diligent inquiry as to the location of the witness, and

that the motion for a new trial was not acted upon until eleven days after judgment of conviction was entered, it was not made to appear on the hearing of the motion for a new trial that appellant or his counsel had made further effort to discover the whereabouts of the witness. We think, in view of the averments of the application itself, the learned trial judge was warranted in concluding that it was not probable that the attendance of the witness could be secured at another trial of the case. The witness evidently disappeared, leaving behind no clue to locate him. If the parties were unable to locate the witness after making diligent inquiry for over a month, the trial court, in passing on the application for a continuance and motion for a new trial, would seem to have been justified in concluding that the prospect of ever locating the witness was but meager. See Hall v. State, 79 Tex. Cr. R. 463, 185 S. W. 574; Hoover v. State, 107 Tex. Cr. R. 600, 298 S. W. 438; Brocknight v. State, 87 Tex. Cr. R. 428, 222 S. W. 259; Shield v. State, 38 S. W. (2d) 76; Sinclair v. State, 34 Tex. Cr. R. 453, 30 S. W. 1070; Roquemore v. State, 59 Tex. Cr. R. 568, 129 S. W. 1120."

Bill No. 3 complains because of the trial court's failure to grant his special plea to the jurisdiction of the court, in which it was claimed that this 77th Judicial District of Limestone County had no power in said cause other than to dismiss this cause for lack of jurisdiction in that it was not shown that Lizzie Reinhart was killed in Limestone County, the forum of the trial. We presume that appellant's contention is that because the dead body of the woman was found in Navarro County, that the venue of this cause should have been in that county.

Sheriff Simmons testified: "The house of the defendant and where I found the mattress which has been exhibited in court here is located in Limestone County, Texas." We think this testimony, taken with other circumstances shown, as well as appellant's confession, was sufficient to show that this unfortunate woman died in her bed in Limestone County, Texas, in hers and this appellant's home. We also notice that the presumption on appeal is in favor of the proof of venue, unless an issue was made thereof in the court below, and same is shown by proper bill. See Branch's P. C., p. 235, Sec. 452.

Bill No. 4, in effect, is a motion to quash the indictment because of an alleged variance in the actual name of the deceased

and the name alleged in the indictment. It was contended that the indictment set forth the deceased's name as Lizzie Reinhart, whereas her true and correct name was Lizzie Reinhardt. We think the two names are idem sonans, sounding the same.

Bill No. 5 sets forth a motion to quash the indictment because of many claimed irregularities (1) Because of the failure of the minutes to give the name of the appellant in the entry showing receipt of the indictment from the grand jury by the court. While Art. 394, C. C. P. requires that the fact of a presentment of an indictment must be noted in the minutes, we do not think it goes so far as to say that the name of the person charged *must be* also entered in the minutes, provided such person is in custody or under bond. The statute says:

"The fact of a presentment of indictment in open court by a grand jury shall be entered upon the minutes of the court, noting briefly the style of the criminal action and the file number of the indictment, but omitting the name of the defendant, unless he is in custody or under bond."

The main purpose of the above first portion of this statute is to establish the identity of the true bill in order that only true bills be presented against persons to be tried thereunder; the number and style thereof was deemed sufficient to thus establish such identity; doubtless the directed omission being for the purpose of preventing defendants from hearing of their indictment before arrest, and possibly avoiding apprehension.

He next complains of the alleged failure of the minutes of the trial court to show that the grand jury finding this indictment was properly sworn. The minutes do show that certain persons who had been legally summoned to appear and serve as grand jurors for the September-October term 1940 of said court, "who after being tested as to their services and qualifications as grand jurors and found qualified, were duly impaneled as such grand jury," giving the names of twelve men. We think that the word "empaneled" carries with it the implication that they were sworn as such grand jurors. We find in 21 Tex. Jur., p. 108, the following: "Impaneling a grand jury consists in testing the qualifications of the persons summoned for duty, and swearing in those found to be qualified." Again, it is said on page 110, idem: " * * * but it (taking the oath) will be conclusively presumed that this has been done in the absence of any showing in the record to the contrary." See

Chevarrio v. State, 17 Tex. Cr. App. 390; West v. State, 6 Tex. Cr. App. 485; Thomason v. State, 2 Tex. Ct. App. 550. All other matters found in such motion to quash are not deemed of serious import and are overruled.

Bill No. 6 presents appellant's objections to the trial court's charge. We think the charge, as finally completed, was a fair presentation of the law as called for by the facts presented, and overrule such objections thereto.

Bill No. 9 is an objection to the introduction of a life insurance policy on the life of the deceased, payable, in the event of death, to appellant. We think the State was within its rights in thus offering this proof. The jury might have used same as a probable motive for the killing.

Bill No. 10 relates to the State's counsel asking the witness Spencer relative to whether there was any blood on the clothing of the deceased when her body was found by the roadside in Navarro County. We think this was permissible testimony. It was the thing itself, the res, and as such, although it might have had an unfavorable action upon the jury, it was necessary for the State to show that this woman met a violent and unlawful death, and if her blood was in evidence, it went far to show that she had been violently treated by some one. We overrule this bill.

Appellant offered many character witnesses, the major portion of whom placed their knowledge of such character during his residence at or near the town of Farrar, fifteen or twenty years prior to the trial. One Ray DeBerry testified that he had known appellant more recently, and that his reputation was good for being quiet, peaceable and law-abiding. The State then asked him if he knew of appellant in the past three years living with a woman to whom he was not married. The witness answered yes, he had heard that gossip. He was then asked if he had also heard that previously the appellant had also lived with a woman to whom he was not married in Marlin, and the witness denied having heard such gossip or rumor. This incident is made the basis of bill No. 11, and we are not impressed with its seriousness. There was no denial, but instead positive proof, that he was living with the unfortunate deceased woman, and had a child by her who was twenty-two months old at the time of Lizzie Reinhart's death, and we do not think this question asked, surely in good faith, and answered

in appellant's favor, could have any undue or unfair influence upon the jury in their deliberations. See Vallone v. State, our No. 21011, not yet reported (141 Texas Crim. Rep. 220). To the same effect is bill No. 12, and our ruling is the same.

Bill No. 13 complains because the court permitted the State to ask the witness Matthews if he detected by any other sense than by sight what was in the bundle that he found by the roadside that contained the dead body of the deceased. The witness answered that he did not. If error, which we do not say, the answer seems to have cured same.

Bill No. 14 relates to the testimony of Mr. Ellett, a neighbor of appellant's who testified to having seen the deceased a few days prior to her death, and that she was pregnant. We think this was admissible under the circumstances to show a probable motive upon appellant's part as well as identification. It is also noted that Dr. W. W. Carter testified to practically the same facts, and we find no objection herein thereto.

Bill No. 15 relates to the fact of Dr. Carter giving his judgment or estimate as to how long the deceased had been dead at the time he saw her body. It seems that the doctor was a practicing physician and surgeon of many years experience, and we think he was properly qualified to give his judgment on such matter.

Bill No. 16 reflects the following occurrence: At the time of the discovery of this body in the weeds near Corsicana, it was badly decomposed, and after an autopsy, the body was given a Christian burial in a cemetery on September 2, 1940. It afterwards became necessary to establish the identity of the dead body, and, under proper order of the court, same was exhumed on September 6, 1940, and identified as that of Lizzie Reinhart. The witness Wareing who saw the body in the weeds by the roadside was used by the State to testify that the exhumed body was the same that he saw in the weeds at the roadside near Corsicana, and the same body upon which the autopsy was performed, thus finally establishing the identity of the deceased. We think this testimony was proper, and although same might have been prejudicial, it was necessary to establish the connection between the body found in the weeds and the one exhumed, the latter being identified as the person mentioned in the indictment.

Bill No. 17 reflects no error, in our opinion, and is overruled.

Bill No. 18 complains of the following incident: It seems that the jury, after they had completed their deliberations, returned into court the following verdict:

"We the jury find the defendant guilty of murder with malice or forethought and access his punishment at death. E. L. Crow, Foreman of Jury."

The district judge, without consulting the jury, took such verdict and changed the same to read as follows:

"We the jury find the defendant guilty *as charged in the indictment* of murder with malice or forethought and *assees* his punishment at death. E. L. Crow, Forman of Jury."

The court then directed the district clerk to read the changed verdict to the jury, which was done, and then the court asked the jury if such was their verdict, to which they responded in a body "Yes."

Mr. Branch says in his Penal Code, p. 333, Sec. 651:

"If the court considers the verdict informal he has the right to refuse to receive it, and to either reduce it to the proper form with the consent of the jury, or, if they refuse to have it altered, to have them retired to deliberate further," citing many cases.

We think the trial court's action was entirely proper and within his rights.

We also think that the phrase "malice or forethought" was intended to and did mean "malice aforethought," and although same should have been corrected, neither bad spelling nor bad grammar should vitiate a verdict when the intention of the jury can reasonably be ascertained. See Branch's P. C. p. 331, Sec. 646.

Bill No. 19 complains because Dr. W. W. Carter was allowed to testify that he delivered a *well developed* baby from the deceased's body by Caesarian operation, the portion objected to being the fact that the child was "well developed." We think the trial court's qualification to this bill, which we quote, answers this objection:

"The court admitted proof of the pregnancy of deceased as showing motive for the killing, the testimony showing without contradiction that the defendant had been living continuously with deceased without benefit of wedlock for approximately three years preceding the killing. Proof that the baby was fully developed was admitted to show the imminence of childbirth at the time of the killing, a circumstance which the court considered admissible as showing motive."

Bills Nos. 20 and 21 are overruled.

Bill No. 22 is incomplete in that such bill does not show what testimony the witness Arnett gave, nor what testimony was objected to by appellant. This same vice appears in bill No. 23, and both are overruled. We can not go to the statement of facts to ascertain what the testimony of such witnesses was that was thought to be objectionable.

Bill No. 24 relates to the introduction of a mattress in evidence over appellant's objection, such mattress being claimed to have come from appellant's home, and shown to have certain circles cut out of the ticking on same, it being the mattress upon which the deceased had lain when killed, according to appellant's statement introduced in evidence, the blood stain thereon having been previously removed therefrom. We think the matter was but illustrative of what had been already in evidence, and see no error in its exhibition before the jury.

Bill No. 25 relates to Dr. Carter's statement relative to his observation of appellant while the witness was testifying concerning appellant's plea of insanity. We think the testimony relative to the actions of the person thus observed as to the peculiarity or non-peculiarity of such subject's acts was proper.

Bill No. 26 relates to the following occurrence: While the State's attorney was addressing the jury in an opening address, he read to them the court's charge. While so doing he came to the portion thereof which reads as follows:

"The defendant in this case did not take the stand as a witness, and you are instructed that you must not discuss, allude to or refer to his failure to testify in any manner; and you will not consider his failure to testify in passing upon any issue in this case nor as a circumstance against him."

Immediately upon reading the same, he made the statement: "Don't do that." Promptly upon objection being made thereto, the trial court sustained the objection. Nevertheless appellant's attorneys reserved an exception to such statement by the attorney on the ground that same was an allusion to appellant's failure to testify in this case. We do not agree with this contention. It appears that the State's attorney was merely attempting to advise or request the jury to remember and follow out the trial court's admonition relative to a discussion or consideration of appellant's failure to testify. The statute, Art. 710, C. C. P., reads in part as follows:

"Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause. * * *."

We are impressed with the idea that the State's attorney was merely using an extra precaution to see that the jury complied with the court's instruction, and did not himself allude to nor discuss the appellant's failure to testify. We do not think error is evidenced herein, and in support of this position we refer to the cases of Wimberly v. State, 6 S. W. (2d) 120; McPhail v. State, 26 S. W. (2d) 218; Goldsberry v. State, 242 S. W. 221.

Bill No. 27 is based on objection to the search of an automobile the morning after appellant's arrest. The bill is defective in that nowhere therein is it shown what, if anything, was found in said automobile by the searcher, nor does such bill show that same was searched without a warrant to thus search. Neither does it show that the automobile thus supposedly searched was the property of the appellant, or used by him. The testimony objected to, and all the testimony objected to, was as follows: "I had occasion to examine an automobile down at Mrs. Herman Chandler's on the next morning." The objection was as follows:

"We object to any search he made of the automobile, for the same reasons, that he did not have a search warrant to look into the automobile from this defendant, and that any evidence that he might have obtained by reason of that search would be illegal and inadmissible for any and all purposes."

This bill is overruled.

Bill No. 28 complains because one H. L. Robertson testified that: "I found a pistol. I found it in what I call the west room of the house. I do not exactly know directions out there." It was shown that the witness was in company with the sheriff of Limestone County, and the sheriff had previously testified that he had the permission of appellant to go out to appellant's premises and search the same, and the witness was acting under the sheriff's orders and was of the opinion that the sheriff was there at the time.

We also think the fact of the finding of this pistol admissible on account of the statement made in appellant's confession, it being the same pistol claimed to have been used in the homicide. This bill evidences no error.

Bill No. 29 is incomplete in that it does not show what the answer of the witness would have been to the question propounded by the appellant's attorneys, and which the trial court refused to allow the witness to answer. The bill can not be considered. See Hill v. State, 230 S. W. 1005; Perea v. State, 227 S. W. 305; Trinkle v. State, 131 S. W. 583. Subject to the same criticism do we find bill No. 30 as was bill No. 29, and under the authorities there cited we overrule bill No. 30.

Bill No. 31 is in the same condition as bills Nos. 29 and 30, and our ruling is the same, as well as bill No. 32.

Bill No. 33 relates to the introduction of a mattress in evidence, which mattress seems to have been obtained by the sheriff upon a search of appellant's premises, which search was contended by the State to have been made by the sheriff upon the permission of the appellant. It can be gathered from the testimony that appellant was arrested at his home by this sheriff; that after his arrest, and having been brought to Groesbeck, the sheriff testified:

"The defendant gave me permission to go out there and get anything I pleased, after I got to Groesbeck, and also assisted in dividing the stuff. When he told me that I had permission to go the first time, I understood there was no limitation on that permission. He did not say there was. He asked me to go up there one time.

"By Mr. Fox: He did not tell me that I could go back the third time and get the mattress. I did not ask him."

Again he testified: "I am L. S. Simmons and also called Luther Simmons. I live in Groesbeck, Texas, and am sheriff of Limestone County. I found a mattress out at the defendant's home. The defendant had given me permission to go and look around in the house and to get anything out of the house that I wanted; and, pursuant to such permission, I got that mattress, the binder cord and a gun."

There was no contradition nor denial of this testimony. It is a well established rule that a person can waive the provisions of the statutes relating to obtaining a warrant in order to search a private residence as is shown by a long line of this court's decisions. See Davidson v. State, 72 S. W. (2d) 591; Raulie v. State, 55 S. W. (2d) 562; Frazier v. State, 43 S. W. (2d) 597; Hogan v. State, 74 S. W. (2d) 988, and many other cases. This bill is overruled.

Bill No. 34 is defective in the same particulars as bill No. 29, and is overruled.

Bill No. 36 is an objection to Dr. Stanley Cox testifying as to his opinion on the sanity of appellant. It was shown that the witness was qualified as an expert, and we think he was entitled to give his opinion in such matters.

Bill No. 37 relates to the testimony of Dr. Stanley Cox as to how appellant appeared and acted at the time appellant made and signed the written statement introduced in evidence. Appellant plead insanity, and we think such testimony was admissible on that ground as well as on the ground of the voluntariness of the statement so made.

Bill No. 38 which relates to an objection to a witness testifying that at the scene of the exhumation of the deceased's body that "they raised the casket," the objection being based on the proposition that the officers had not obtained a legal order to disinter the body of Lizzie Reinhart. The objection defeats itself in that on page 5 of the transcript it is shown that upon the application of a brother of the deceased the district judge ordered the sheriff of Limestone County to disinter this body. Also see our ruling on bill No. 16.

Bills Nos. 39 and 40 relate to the confessions of the appellant, both of which were dated September 4, 1940, and are very similar in their contents. It appears from the statement

of facts that after the finding of this woman's body the sheriff's department of the neighboring county to Limestone County, as well as that sheriff, were active in endeavoring to ascertain who the deceased was as well as who was responsible for the offense. That appellant was finally arrested about 9 o'clock on the night of September 3, 1940, and brought to the county jail. The diligent officers began questioning him, and finally obtained some information, in which he endeavored to lay this crime on another person. That they went and brought such other person to the jail, and appellant retracted such incriminatory statement relative to such other person, and then made an oral statement to such officers in the presence of certain newspaper men; that these newspaper men desired to have a picture of appellant, and he consented to go with them to a photographer in the early morning hours, and his picture was taken. The officers then returned him to the jail, and his statement was reduced to writing and signed by him in the presence of witnesses. The method in which one of such statements was taken was that some questions were asked the appellant and he would refer the questioner to the person to whom he had made the oral statement, and when that person would answer, the appellant would say "that is correct." When such statement was finally completed, it was read over to him and he said that it was correct, and then signed the same in the presence of witnesses. This statement bears a proper warning, and, according to the testimony, there was no coercion nor undue influence offered to him in anyway. This was about 3 o'clock in the morning. This first statement seemed to have been taken in the city of Mexia, in the county of Limestone, and appellant was then taken to the jail in Limestone County, and at about 5 o'clock in the morning another statement was taken in the presence of Dr. Stanley Cox, County Health Physician. It seems that at such time the physician examined the body of appellant and testified that there were no evidence of any bodily mistreatment of appellant in anyway; that his blood pressure was about normal, and that he appeared to be in good physical condition; he did not seem to be excited in anyway, but was perfectly calm, and seemed to be making this statement voluntarily. At such time, however, this witness testified that the warning given this appellant was that same could "be used for or against him," and the presence of such statement is one of the subjects of a bill of exceptions. This matter became a question of fact, however, in the trial of this case in that other witnesses testified that the warning given merely stated that same "could be used against him," and did not state that it

could be used "for him." The written portion of both statements contained the proper warning relative to such use. The question of the adequacy of the warning then became a matter of fact, which was by the trial court submitted to the jury to decide before they considered the written statement. We quote from the case of McVeigh v. State, 62 S. W. 757:

"The state's witnesses (the sheriff and his deputy) testify that a proper warning was given, to wit, that they told appellant before he confessed to the theft that same would be used against him as evidence. However, appellant introduced two witnesses who stated that the warning given was that his statement could be used for or against him. If this was the warning given, this confession was not admissible. Guinn v. State, 39 Tex. Cr. R. 257, 45 S. W. 694; Unsell v. State, 39 Tex. Cr. R. 330, 45 S. W. 1022. If this were the only question made as to the warning given, it being a matter of controversy as to the character of warning, one being legal and the other illegal, we would hold that a proper charge of the court, submitting this issue to the jury, was the correct practice."

Outside of the presence of the jury, and for the purposes of this bill No. 39, the physician, Dr. Cox, gave the court certain testimony, a portion of which we herein set out:

"Upon your request I came to the county attorney's office on September 4th, about 5:30 or something like that. Before we started taking the confession of Arlin F. Reese, you warned him that any statement that he might make could be used against him. Absolutely, you did not use any coercion whatever on him in making the statement. No one else used any coercion. Absolutely, we talked to him in a low tone just as we talked to you. And told him that he did not have to make it and it was absolutely in his own discretion. That is right, we did examine him after we had the confession, by removing his clothes and looking at his body. There was no sign of any blows on his body, the only mark I saw was a tattoo mark on one of his arms. When I went to examine him physically he thought it was foolish and stated that no one had laid their hands on him. This was a narrative form of statement; that you only asked questions when you could not understand a particular point. He started off by saying; 'My name is Arlin F. Reese; I live in Limestone County, out about three miles from Mexia, Texas.' He did not say that in answer to any question of yours. He began the narrative, and went

completely through the entire statement, the narrative. He did not look as though he might have been mistreated. He did not at all look as though he was excited or afraid. And told it as coolly as if he and I were sitting down at a friendly conversation. I saw every bit of the confession made. And saw him sign his name. And initial each page. I did not see you copying anything from the other confession. I did not notice where you got the blank form. I was sitting on your right and you had this on your left. This statement was read to him after it was made."

We also quote a portion of the testimony thus taken for purposes of the bill of Clarence Ferguson, the assistant county attorney:

"There is no material difference between the first and second confessions. The main difference between the two is that the second, the one taken in Groesbeck, is a little more in detail. It takes the defendant through another day, the day previous to the killing, and on up to the day he was arrested. He said, 'Let me tell you what I did on Wednesday before the crime was committed on Thursday.'

"At the defendant's request I did put that in the second confession. In the taking of this second confession Mr. Reese did the talking. I said, Mr. Reese, sit down there and tell me the entire story. I do not want to ask you any questions about it.' I asked him a question only when something was not clear or that I did not understand. I did not have the first confession present and did not use it in taking the second one; I did not refer to it in anyway. This second confession is a narrative in the words of the defendant. In regard to the gun mentioned by the defendant, when the defendant reached that portion of his confession where the gun was mentioned, stating it was a 22 target pistol, I asked what the number of the gun was and suggested that we examine it or something to that effect. The defendant picked the gun up and unbreached it and looked at the number and gave it to me as so and so. At no time, either during the giving of the confession in Mexia or in Groesbeck, was the defendant reluctant, and at all times he was very calm and told the story in a manner in which two people would who were sitting down, talking and showed no evidence of fear. He was stoically calm. He almost disturbed us."

It also appears from the record that at the time the last confession was made, the appellant was held under a warrant of arrest, and was immediately taken before a magistrate, waived examination, and was then placed in the county jail. This occurred about 5 o'clock in the morning. It seems that the vigilant officers spent the night in unraveling this mystery, a part of the time on false clues given to them by appellant, and from all the testimony we can see no reason to base any criticism upon their actions in the matter. It is true that the appellant had been up all night, as well as the officers, but oftentimes it becomes necessary that investigations be had at once relative to criminal offenses, and if such time be at night, such can not be remedied. We think the record here presented to be remarkably free from any coercion or undue influence in order to obtain these statements from appellant. Conscience ofttimes is thought to operate upon the will of a human being and cause him to have a desire to tell the truth relative to an act that he has wrongfully committed, and we do not think it would be an improper conclusion to draw in saying that the thought of the violent death of this woman, whether a legal wife or not, who had borne him one child and was ready to bear another, weighed heavily upon his conscience, and may have insistently pointed him to a desire to relieve its promptings by telling to some one this sordid story. We think these confessions were admissible.

All other bills not written upon have been considered and are overruled.

We have thus written at length on this case because of the many bills and the severity of the verdict, and wish to commend the attorneys for the appellant for their able brief and conscientious labors in his behalf. This record evidences many difficulties encountered in the trial of this case, which we think have all been legally overcome, and we find no error set forth herein.

The judgment will therefore be affirmed.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Counsel for appellant renew their contention that the trial court committed error in admitting in evidence the two confessions of appellant, which complaints are brought forward

278

in bills of exception numbers 39 and 40. We have examined said bills again, and because of the extreme penalty have also reviewed the statement of facts for such information as it might give on the subject. After having done this it occurs to us that the issue of the confessions have been improperly obtained was not even raised by the evidence, and the careful trial judge appears to have submitted the question through an abundance of caution.

The complaint brought up in bill of exception number 33 regarding a mattress found in appellant's house and introduced in evidence by the State was fully considered and discussed in our original opinion. The question has again been examined in the light of appellant's motion and our views remain as originally expressed.

The point presented in bill of exception number 16 seems to be without merit.

The case was discussed at length in our original opinion and to have considered the questions urged in the motion for rehearing at any length would have in large measure been a repetition, hence we have stated our conclusions rather than the reasons upon which they are based.

The motion for rehearing is overruled.