Thomas Lennon DUNN, Appellant,

v.

The STATE of Texas, Appellee.

No. 69463.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 5, 1986.

William M. Routon, II, Tyler, for appellant.

Jack Skeen, Jr., Dist. Atty., and Louis F. Mathis, Asst. Dist. Atty., Tyler, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TEAGUE, Judge.

Thomas Lennon Dunn, hereinafter referred to as the appellant, was charged by a two count indictment with committing the offense of capital murder of Francis Willingham on June 27, 1984, "by stomping on her body with his foot and hitting her in the head with his hand," which occurred while the appellant was either (1) in the course of attempting to commit or committing the felony offense of burglary or (2) in the course of attempting to commit or committing the felony offense of aggravated sexual assault. See V.T.C.A., Penal Code, Section 19.03.[1] The jury found appellant

---

1. Section 19.03, supra, provides that a defendant commits the offense of capital murder if he commits the offense of murder and "(2) intentionally commits the murder in the course of committing or attempting to commit ... burglary ... [or] aggravated sexual assault ..."

guilty under the first count, and also answered in the affirmative the three special issues that were submitted to it pursuant to Art. 37.071, V.A.C.C.P.[2] Based upon the answers, the trial judge assessed appellant's punishment at death.

The appellant presents five grounds of error for review. Because we will sustain his fourth ground of error, which asserts that "The trial court committed reversible error in admitting State's Exhibits 2 and 3 into evidence as there is insufficient evidence to rebut appellant's assertions that the statements contained therein were obtained by promises and coercion, and that therefore they were not voluntarily given," we will only review that ground of error and his fifth ground of error, which contends that the evidence is insufficient to sustain the jury verdict finding him guilty of committing capital murder while committing or attempting to commit the felony offense of burglary.[3]

We review the latter ground of error because of *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), also see *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), and this Court's past decisions, see, for example, *Selman v. State*, 663 S.W.2d 838 (Tex.Cr. App.1984), in which it was held that a challenge to the sufficiency of the evidence should be considered before disposing of a case even though reversal may be based on another ground of error.

Therefore, we will first consider the appellant's claim that the evidence adduced was insufficient to sustain the verdict of the jury finding him guilty of the offense of capital murder committed during the course of committing the underlying felony offense of burglary or attempted burglary.

We pause to point out that in deciding the sufficiency of the evidence, *all* of the evidence, both *proper and improper*, must be considered in deciding that issue. Furthermore, when reviewing the sufficiency of the evidence, this Court is bound to review the evidence in the light most favorable to the jury's verdict. The Federal Constitutional test, which this Court has adopted, is whether, after viewing *all* of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Also see *Griffin v. State*, 614 S.W.2d 155 (Tex.Cr.App. 1981); *Porier v. State*, 662 S.W.2d 602 (Tex.Cr.App.1984); *Gardner v. State*, 699 S.W.2d 831 (Tex.Cr.App.1985); *Bain v. State*, 677 S.W.2d 51, fn. 1 (Tex.Cr.App. 1984).

The material facts that were presented to the jury reflect the following:

Kerry Watkins, a fourteen-year-old neighbor of the deceased, testified that while riding his horse and getting the family mail he saw the deceased "between 10:00 and 10:30 o'clock a.m." on the morning of the day when her body was found inside her residence, which occurred around 4:30 o'clock p.m. When Watkins saw the deceased, she was driving her automobile in the direction toward her residence.

Vernon Willingham, the husband of the deceased, testified that on the day in question, around 7:00 o'clock a.m., he left their residence and went to work. His wife was alive and appeared to be in good health at that time. Willingham had no contact with his wife during the day. After work that

---

2. The questions were: "Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result"; "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"; and "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased?"

3. The appellant's other grounds of error concern the admissibility of an extraneous criminal trespassing offense that occurred in 1981 (the offense at bar occurred in 1984), see *post*, and the admissibility of his confession, which we will hold, for reasons to be stated, should not have been admitted into evidence. We will discuss the admissibility of the confession pursuant to appellant's fourth ground of error.

day, Willingham returned home at approximately 4:30 o'clock p.m. Soon thereafter he observed glass scattered on the back patio of his and his wife's residence. Fearing that a pressure cooker that his wife might have been using had exploded, Willingham ran inside of the house where he soon found his wife in their bedroom. He almost did not recognize her because of the injuries that had been inflicted upon her body during his absence. His wife was then dead. It was later discovered that her purse had been taken, but neither the purse nor its contents were ever located by the police. Thereafter, and notwithstanding the fact that he was then in a state of shock, Willingham managed to obtain assistance in notifying the authorities, who, by Willingham's testimony, responded in approximately 40 minutes.

Willingham also testified over objection that approximately one week before the fatal day in question his wife, who was "scared of black males" and would not have "let a black male into the house when she was by herself," informed him that she had seen a black male person prowling around their residence. There is no evidence, however, that might reflect or indicate that this black male and the appellant, who the record reflects is also a black male person, are one and the same person.

The autopsy report, also see *post*, reflects that the deceased had sexual intercourse with a male person within 24 to 36 hours of her death. Willingham testified that he did not have sexual intercourse with his wife within that time frame.

No identifiable fingerprints or palmprints were recovered by the police from either the inside or the outside of the residence. Other than the deceased's purse and its contents, nothing else was apparently taken from the residence.

C.B. Roberts, a neighbor of the Willinghams, testified that when he went home for lunch on the day in question, at approximately between 11:15 and 11:30 o'clock a.m., he observed a four door hardtop General Motors type vehicle parked approximately 75 to 100 yards from the Willingham residence. When Roberts left his residence to return to work he noticed that the vehicle was no longer parked where he had earlier seen it, "Not to my knowledge." He identified a photograph of a motor vehicle as being the same vehicle he saw that morning. This vehicle was subsequently identified as one belonging to the appellant.

John Whitham, a Deputy Sheriff for Smith County, testified that when working on this case he recalled that in the early part of October, 1981, the Sheriff's Department made an investigation of a criminal trespass incident that had occurred at the residence where the deceased's body was found by her husband. At that time the deceased and Willingham were not then married and the deceased apparently lived alone in the residence.

Over objection, Phil Megason, who then worked as a patrol officer for the Smith County Sheriff's Department, testified that on *October 8, 1981*, which was almost three years prior to when the deceased was murdered on June 27, 1984, he responded to a call concerning the residence of the deceased. After arrival at the residence, Megason observed a person later identified as the appellant coming out of a gate next to a fence on the outside of the residence. The appellant told Megason that he was where he was situated because he had just returned from urinating in private and out of the public view. Megason arrested the appellant for criminal trespass and handcuffed him to a tree. The now deceased arrived at her residence and told Megason that she did not recognize the appellant and also told Megason that she had not given him permission to be on her premises. She advised Megason that she would file criminal trespass charges against the appellant. Although appellant was apparently charged with committing the offense of criminal trespass, the record does not reflect or indicate the disposition of the charge.[4] Other than the appellant's extra-

---

4. There is, however, testimony in the record that reflects or indicates that appellant was then

judicial handwritten confession, the oral "clarifications" of the confession which were tape recorded, and the above testimony going to the "trespassing" incident, there is no direct testimony or evidence in the record connecting the appellant either to the deceased or to her residence.

Dr. Stanley Lightfoot, a pathologist, testified from records of his office that reflected that a Dr. Gonzales of his office performed an autopsy on the body of the deceased. The autopsy report reflects, inter alia, that the deceased died as a result of multiple traumatic injuries. Dr. Light-

foot testified that the autopsy report reflected that the deceased had had sexual intercourse with a male person "within less than twenty-four to thirty-six hours" of her death. He placed the time of death between 10:00 o'clock a.m. and 3:30 o'clock p.m. on the day in question.

Over objection, Buck Fontenot, a Smith County deputy sheriff, testified that he obtained a handwritten confession [State's exhibit number 2] from appellant and also had a tape recorded interview session with appellant, which was later transcribed [State's exhibit number 3].[5] For purposes

---

on parole and the trespassing charge was used to revoke his parole.

5. We pause to point out that it was agreed at the hearing on the motion to suppress the appellant's confession and the tape recorded "clarification of the confession" that was held in this cause that a hearing held in another unrelated case in which the appellant had been charged with committing the offense of aggravated sexual assault would be considered as evidence for purposes of the hearing that was held in this cause. The appellant's conviction for aggravated sexual assault in that cause has been affirmed in an unpublished opinion by the Tyler Court of Appeals. See *Dunn v. State*, No. 12–84–0235–CR, July 31, 1986 (Appellant's P.D.R. in that cause is now pending before this Court).

Fontenot testified at the hearing held in the unrelated cause that, for reasons not reflected in the record, the appellant became a suspect in the murder of the deceased that occurred on June 27, 1984. Apparently at that time the appellant was also a suspect in another, but unrelated, case, namely, an aggravated sexual assault case. As a result of Fontenot's suspicions, on June 28, 1984, the appellant's name was run "through our NCIC computer," as a result of which the Smith County authorities learned that an outstanding arrest warrant was then pending against the appellant in North Las Vegas, Nevada. Based upon that information the appellant was arrested at his place of employment on June 29th. He was taken to the county jail where he was booked and photographed. This photograph was later used in a "photographic" type lineup at which the appellant was identified on July 2nd as the wrongdoer in the aggravated sexual assault case.

On June 30th, at 5:30 o'clock p.m., Eastern Daylight time, 4:30 o'clock p.m. Tyler time, the Federal Bureau of Investigation notified North Las Vegas that Smith County had the appellant in custody.

On July 2nd, at 8:30 o'clock a.m. Tyler time, the Smith County authorities sought to confirm the North Las Vegas warrant by contacting the

Vegas authorities and notifying them that they had the appellant in custody pursuant to their outstanding warrant. On July 3rd, at 8:42 o'clock a.m., Pacific time, which would have been 10:42 o'clock a.m. Tyler time, North Las Vegas authorities notified Smith County that it would not seek to extradite the appellant and had cancelled their N.C.I.C. entry on the appellant.

As noted, at an unknown time on July 3rd charges were filed against the appellant for the aggravated sexual assault offense, and he was again arrested and taken before a magistrate where he was given his *Miranda* warnings for that offense. The appellant did not give his handwritten confession to Fontenot and the tape recorded interview session between Fontenot and the appellant did not occur until July 5th.

In challenging the validity of his confessions, the appellant does not assert or claim that Smith County had the information from North Las Vegas that that authority was going to cancel its N.C.I.C. entry when he was charged with the aggravated sexual assault offense, nor does he claim that there was any causal relationship between his confessions and the N.C.I.C. entry.

Be that as it may, on July 5th, when the appellant was in lawful custody, because of the charge lodged against him for the aggravated sexual assault offense, he, the appellant, told Fontenot that "he would like to bring a statement form up to his cell and write out his own statement as to the killing of Mrs. Francis Willingham." Fontenot accommodated him, and the appellant wrote out in his cell a statement in his own handwriting in which he admitted that on the date in question he went to the residence cf an unidentified female and murdered her by beating her to death, and thereafter took her purse but threw it away. When the appellant wrote out his confession no law enforcement officer was then present. As noted, neither the purse nor its contents were ever recovered. After appellant personally wrote out the statement and gave it to Fontenot, Fontenot then asked the appellant if he could interview him on tape in

of our discussion, we will treat the exhibits as amounting to only one confession. The exhibits were admitted into evidence over objection.

The appellant presented several witnesses, including himself, at his trial. His defense was alibi. He repudiated the contents of his confession.

Mae Tilley, who was then appellant's girlfriend, testified and also identified the appellant's motor vehicle as the one depicted in State's Exhibit No. 19, which was the vehicle that the witness Roberts had identified. Tilley testified that shortly after noon on the day in question the appellant came to her residence alone and asked if she would like to go fishing with him, and she responded in the affirmative. Tilley invited her two sisters, Wanda Herrington and Esther Robinson, to go fishing with her and the appellant, and they accepted the invitation. The appellant told Tilley that he had been helping Geraldine Waters and Shirley Hardy, who were friends of the appellant and Tilley, move furniture that morning. The group then went to, among other places, "Fifty Cents Lake" where they unsuccessfully fished. They returned to Tilley's residence at approximately 6:30 or 7:00 o'clock p.m., where they ate supper. The appellant spent the night at Tilley's residence.

Robinson, as did Herrington, also testified and corroborated Tilley's testimony regarding the fishing trip.

Waters testified and corroborated the testimony regarding the moving of the furniture that morning. Hardy also so testified.

Marianne Hockley, an employee of The Tyler Warehouse, where the appellant had been employed before he was arrested, testified that the appellant came to work that morning but because there was no work for him to do he did not work that morning.

Hockley testified that she was personally aware that the appellant had spent the morning helping his friends move furniture.

The appellant, who had twice been previously sentenced to serve time in the Department of Corrections for committing the offense of burglary of a habitation, also testified.

The appellant completely and totally repudiated his handwritten confession, as well as the tape recorded "clarifications", see footnote 3 *ante.* He denied being at or inside of the residence of the deceased on the day in question and also denied having sexual intercourse with the deceased. He testified that he confessed to the crime only because "They [Fontenot and Sheriff Brunt,] told me [that] if I didn't [confess] I would get the death penalty," [but that if I did confess] "the death penalty could not be obtained on a confession," and "I would probably get a life sentence."

Fontenot admitted in his testimony that prior to when the appellant delivered his handwritten confession to him he told the appellant that "if he showed some cooperation, some remorse, gave me the confession, showed some sort of concern, that, you know, usually the jury will tend to lean or bend toward him. [But] that if he did not show any cooperation whatsoever, and if I [Fontenot] had to go the whole nine yards in proving the case, that they could see that. And chances are that, you know, his chances [in not getting the death penalty] would be better, yes, sir." Fontenot also admitted that he told the appellant that any confession he gave could be used "both for and against him." Fontenot also admitted that he made these statements to the appellant in order "to induce [the appellant] to confess," "to induce him in his train of thought."

order to "clarify some points that were not too clear on the statement that he had handwritten." The appellant agreed. Thereafter, Fontenot and the appellant had a question and answer session which was tape recorded, transcribed, and signed by both Fontenot and the appellant. Because of their brevity, we attach to this opinion, as "Appendix A", both the appellant's handwritten confession and the transcription of the tape recorded interview session that occurred between Fontenot and the appellant. Appellant asserts in his fourth ground of error that the trial court erred by admitting into evidence over objection the two exhibits.

Appellant admitted in his testimony that on October 8, 1981, the day when he was arrested for criminal trespass, he unlawfully went inside of the residence of the deceased at that time.

The appellant also testified to his activities on the morning and afternoon of the day in question, and testified that he spent the morning moving furniture and spent most of the afternoon unsuccessfully fishing.

In its response to the appellant's contention that the evidence is insufficient to sustain the jury's verdict finding him guilty of capital murder, the State concludes that the evidence overwhelmingly demonstrates that the deceased's "judge, jury and *executioner* was the Appellant," and argues that the appellant's "complaint is with the quality and not the quantity of the evidence...." Given the facts and the law, we are unable to agree with these conclusions.

The record reflects that without any limitation whatsoever the prosecution offered and had admitted into evidence over objection the entire handwritten confession of the appellant, as well as the entire transcription of the tape recorded interview between Fontenot and the appellant, except for an inked out portion in the transcription which appears to be a reference by appellant to a question about his vehicle which he said in the tape recording he parked near the deceased's residence on the day in question.

In addressing the appellant's claim that the evidence is insufficient to sustain the jury's verdict, we first find that the appellant's handwritten confession implicitly, if not expressly, states that the appellant was invited inside of the residence by the female he subsequently murdered, "I ... went out on State Park Highway to see a lady that I had been seeing before (a few years earlier). She told me that this would be the last visit that I would be welcome...." The appellant thereafter admitted in his confession that he caused the death of that person. The appellant's statements, though clearly sufficient to

show that he committed criminal acts that resulted in the death of a female person, are at the same time clearly insufficient to establish that he committed the offense of *murder of the deceased while in the course of attempting to commit or committing the offense of burglary, which the jury found him guilty of committing.*

It is now axiomatic in our law that "where the State puts in evidence the statements of the accused party which exculpate the accused, and does not directly or indirectly disprove them, the accused is entitled to an acquittal." *Palafox v. State*, 608 S.W.2d 177, 181 (Tex.Cr.App.1979), quoting from *Banks v. State*, 56 Tex.Cr.Rep. 262, 265, 119 S.W. 847, 848 (Tex.Cr.App.1909). Also see *Wormley v. State*, 366 S.W.2d 565, 566 (Tex.Cr.App.1963); *Walker v. State*, 138 Tex.Cr.R. 343, 135 S.W.2d 992 (Tex.Cr.App.1940); *Starvaggi v. State*, 593 S.W.2d 323 (Tex.Cr.App.1979); *Pharr v. State*, 7 Tex.Ct.App. 472 (1879)

However, before such rule may be invoked and applied to a case, it is necessary that the statement amount to an admission of guilt by the accused plus an assertion that would exculpate him. See *Simon v. State*, 488 S.W.2d 439, 443 (Tex.Cr.App. 1973).

Based upon the evidence that was adduced, the trial judge concluded that the appellant had satisfied the above requirements and was thus entitled to an instruction to the jury on the issue, and he so instructed the jury.

In *Otts v. State*, 135 Tex.Cr.R. 28, 116 S.W.2d 1084, 1088 (1938), (On State's motion for rehearing), Justice Hawkins, speaking on behalf of this Court, stated the following:

> Where the defendant does not testify in the case, and where the State in developing its case in chief introduces in connection with a confession or admission of the defendant an exculpatory statement which if true would entitle him to an acquittal, the jury should be told that he is entitled to a verdict of not guilty unless such exculpatory statement has been

disproved or shown to be false by other evidence in the case. Without such instruction the jury has no information which may guide them in dealing with the exculpatory statement. The State has no just ground to complain of such instruction, for as heretofore pointed out, the State is not required to introduce the exculpatory statement, but having done so the jury should know how to deal with it, and the jury receives no information upon that subject even though the defensive issue raised by the exculpatory statement is submitted...

The trial judge in this cause instructed the jury in the following manner:

You are instructed that when a confession or statement of a Defendant is introduced into evidence by the State, then the entire admission or confession is to be considered together. The State is bound by any statement therin [sic], constituting, if true, a defense or justification to the charge against the person making the statement or confession, unless such statement is shown by the evidence beyond a reasonable doubt to be untrue. Such admissions or confessions are to be taken into consideration by the jury as evidence in connection with all other facts and circumstances in the case. So, in this case, unless it has been shown by the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, that the statements in the alleged confessions to the effect that the entry of Thomas Lennon Dunn into the Willingham residence was as an invitee, and that the sexual intercourse, if any, was as an invitee, and that the sexual intercourse, if any, was consensual, is untrue, taking into consideration all of the facts and circumstances in this case, then you will acquit the Defendant of the offense of capital murder, and say by your verdict not guilty to the charges contained in Count I (Paragraph 7), and Count II, (Paragraph 8) of the Indictment.

Although the appellant did object to this portion of the court's charge, he makes no complaint on appeal about this part of the charge. The State did not complain in the trial court about this part of the charge. This charge comports with the suggested instruction found in Mc Clung's 1985 *Jury Charges for Texas Criminal Practice*, page 260.

Because the appellant testified, and the law is that before the rule regarding the prosecutor introducing into evidence the accused's exculpatory statements and being bound thereby may be invoked and applied, part of the test is that the defendant not testify, it could easily be argued that under the law the trial judge was too generous to the appellant when he instructed the jury on the issue. See *Otts v. State*, supra. Cf. *Coleman v. State*, 643 S.W.2d 947, 951 (Tex.Cr.App.1982); *Richards v. State*, 511 S.W.2d 5 (Tex.Cr.App.1974).

Nevertheless, in *Benson v. State*, 661 S.W.2d 708 (Tex.Cr.App.1982), it was held that the standard by which sufficiency is measured, which requires that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution, must be applied to the evidence in light of a correct charge that corresponds to the indictment allegations. Given the above instruction, we will decide whether the State disproved the exculpatory statements in the appellant's confessions in light of that instruction. Also see *Boozer v. State*, 717 S.W.2d 608 (Tex.Cr.App.1984); *Williams v. State*, 696 S.W.2d 896 (Tex.Cr.App.1985); *Ortega v. State*, 668 S.W.2d 701 (Tex. Cr.App.1983).

As previously noted, when he testified, the appellant denied that he had ever been in the deceased's residence except for the time in 1981 when he was charged with criminal trespass, denied that he had previously had sexual intercourse with her, and denied that he had killed her. The record also reflects that on cross-examination the

prosecuting attorney, after summarizing the appellant's testimony, asked the following question and the appellant gave the following response:

Q: (Mr. Moore, one of the prosecuting attorneys): Mr. Dunn, (the appellant), if I can summarize your testimony, would it be fair to say that because you were an experienced criminal, because you had been to that house once before [referring to the criminal trespass incident], because you were black and the victim was white, that you—and because Detective Fontenot said, if you confess, a written confession would keep you from getting the death penalty, that because of all of those things, you confessed to a murder that you didn't commit, and you knew they couldn't prove. Is that your sworn testimony to the jury?

A: (By the appellant): Yes, sir.

■ The above rule that when the State introduces an exculpatory statement of the accused into evidence it becomes bound thereby is applicable only when there is no other evidence upon which the jury might base its rejection of the exculpatory portions of the statement. See *Banks v. State,* supra. In this instance, given the fact that when he testified the appellant himself repudiated his entire confession, and thus in turn repudiated the exculpatory portions of his confession, we find that there is a reasonable basis upon which the jury could have rejected the exculpatory portions of the confession. Therefore, we hold as a matter of law that the State disproved beyond a reasonable doubt the exculpatory portions of the appellant's confession—through *no* less than the appellant's own lips.

■ Our inquiry regarding the appellant's challenge to the sufficiency of the evidence, however, does not end here.

Prior to this Court's decision of *Self v. State,* 513 S.W.2d 832 (Tex.Cr.App.1974), the law was well settled in this State that the corpus delicti of an offense consisted of three parts. It was also well settled that a confession of a defendant, standing alone, was insufficient to support a convic-

tion as the law required that the confession had to be corroborated in the sense that the corpus delicti had to be established *and* there had to be other evidence which, of itself, tended to connect the defendant with the offense committed and which was separate and apart from the confession of the defendant. The confession, however, though it could be used to aid in proving the corpus delicti, was, standing alone, insufficient. See, for example, *Smith v. State,* 363 S.W.2d 277 (Tex.Cr.App.1963). However, in *Self,* supra, this Court held that where the defendant gave a valid confession *and* the State established the corpus delicti, which under *Self v. State,* supra, only consists of (1) the body of the deceased and (2) that the death of the deceased was caused by the criminal act of another, and no longer required that the accused must be shown to have been the guilty agent connected with the criminal act, the State could prove the defendant's guilt as the agent guilty of the commission of the crime by his confession unaided by other evidence. (837). No longer was the State required to establish that the defendant must be shown to have been the guilty agent connected with the criminal act, nor was it necessary to establish by independent evidence outside of the confession itself a connection of the defendant with the crime. Thus, under *Self,* supra, if the evidence apart from the appellant's confession reflects that the body of the deceased was identified and death was shown to have been caused by the criminal act of another, the corpus delicti was thus established. If the appellant in his confession admits killing the deceased under circumstances sufficient to prove murder, the evidence will be deemed sufficient to sustain a conviction for murder. *Brantley v. State,* 522 S.W.2d 519 (Tex.Cr.App.1975). However, proof of the corpus delicti may not be made by an extrajudicial confession alone, but proof of the corpus delicti need not be made independent of an extrajudicial confession. If there is some evidence corroborating the confession, the confession may be used to aid in the establishment of the corpus de-

licti. See *Penry v. State*, 691 S.W.2d 636 (Tex.Cr.App.1985); *Troncosa v. State*, 670 S.W.2d 671 (Tex.Cr.App.1984). It now appears that the focus of attention on appeal, when a challenge is made to the sufficiency of the evidence, and the State has introduced into evidence exculpatory evidence through the defendant's confession, is on whether there is independent evidence, aside from the defendant's confession, to corroborate the corpus delicti rather than to corroborate the defendant's confession—in the sense that it is unnecessary to connect the defendant by independent evidence to the crime itself.

■ In this instance, the State clearly established the corpus delicti of the crime in that it proved the identity of the body of the deceased and further established that the deceased had died from a criminal act of violence. It therefore could prove the appellant's guilt as the agent guilty of the commission of the crime by his confession unaided by other evidence, and this may be done by either direct or circumstantial evidence. See and compare *Casey v. State*, 523 S.W.2d 658 (Tex.Cr.App.1975). In this instance, it clearly sustained its burden of proof.

■ The problem that now develops for us to resolve results because the trial judge instructed the jury as follows, which appears to be contrary to what this Court stated in *Self v. State,* supra, and its progeny:

> You are instructed that under our law a confession, standing alone, is not sufficient to authorize a conviction for the alleged offense. So, if you find from the evidence beyond a reasonable doubt that the defendant made a confession to the commission of the offense, still, you cannot convict the defendant unless you find from the evidence beyond a reasonable doubt that there is other evidence before you in this case which, of itself, tends to connect the defendant with the offense commited, if any, separate and apart from the alleged confession, if any, of defendant, and if you have a reasonable doubt that there is such other corrobora-

tive evidence, then you will acquit the defendant.

This instruction appears to have been copied verbatim from the one found in Mc Clung's *1985 Jury Charges for Texas Criminal Practice*, page 243. It unquestionably conflicts with what this Court stated and held in *Self,* supra, and should never be given in this type of situation as long as *Self* remains the law in this State.

■ Under *Benson v. State*, supra, also see *Boozer v. State,* supra, unless the evidence conforms to the above instruction, although erroneous, it is insufficient as a matter of law to support the verdict of the jury.

We find that by first setting out the pertinent parts of the appellant's handwritten confession and his tape recorded "clarifications", and then setting out what the State actually proved, the reader will better see why we find and hold that Francis Willingham, the deceased herein, is one and the same person as the unnamed person in the appellant's confession.

APPELLANT'S HANDWRITTEN CONFESSION AND HIS TAPE RECORDED "CLARIFICATIONS"

1. "On June 27, 1984, I, Thomas Lennon Dunn, went out on State Park Highway (changed to Lake Park Drive in the 'clarification') to see a lady"

2. "That I had been seeing before (a few years earlier.)"

3. "I hit her and knocked her down ... I stomped her three or four times and hit her once or twice ..."

4. "I tried to make it look like someone had broken in by knocking out the patio door glass and taking her purse."

5. "Before I left I went back to the bedroom and put a pillow over her face."

6. Inferentially, one can deduce from the confession that the appellant and the deceased had sexual intercourse.

7. "She did not seem to be breathing ... I left her like that and tore her clothes before I left the house ..."

8. "[W]hen I first got there we sat, you know she got like a dining room and a kitchen and she was in the kitchen, had a pressure cook on, and then she said let me turn this off because it will blow up if I don't turn it off. Then we went to the back bedroom."

9. As to where his car was parked during this time, the appellant stated in his confession that it was parked "Down the street. I couldn't park at the house, somebody might see it." The appellant admitted in his confession that his car was "a red 1975 Oldsmobile, white vinyl top."

### STATE'S PROOF

1. Watkins, a neighbor of the deceased, testified that he lived on Lake Park Road and last saw the deceased alive on the day in question at approximately 10:30 o'clock a.m. when she was driving toward her residence. Willingham, the deceased's husband, testified that he and the deceased lived on Lake Park Drive. He discovered her body at approximately 4:30 o'clock p.m. on the day in question.

2. There was evidence that on October 8, 1981, several years earlier, the appellant trespassed on the premises of the deceased and that she filed criminal trespass charges against him.

3. The autopsy revealed that the deceased sustained a fracture of the right mandible, a fracture of the right clavicle, and several fractures of the ribs that perforated the lungs, and that she died of multiple traumatic injuries.

4. There was evidence that the deceased's purse was taken and that one of the patio glass doors to the residence had been broken and the glass shattered on the back patio.

5. The deceased's husband testified that he did not give consent for anyone to enter his residence and murder his wife.

6. There was evidence that shortly before her death the deceased had sexual intercourse with a male person.

7. When found at approximately 4:30 o'clock p.m. the deceased was then naked and dead, and a pillow was found on top of her breasts. Death occurred between 10:00 o'clock a.m. and 3:30 o'clock p.m. on the day in question.

8. The deceased told her husband when he left home that morning for work that she was going to can that day and would be using the pressure cooker. When he returned home, he observed scattered glass from a broken patio glass window that caused him to believe that the pressure cooker had exploded. After he entered the residence he observed that "the cooker was sitting off of the stove, back of the burner. One of the burners was still full blast. It was solid red, and I turned it off."

9. An automobile that was identified as the appellant's was observed parked down from the residence of the deceased near the noon hour that day and not too long after Watkins had seen the deceased when she was alive.

 We agree with the appellant that the facts could have been better developed and should have been much stronger from the State's standpoint. However, notwithstanding our agreement, we are able to find and hold that any rational trier of fact could have inferred or deduced from the evidence and testimony that the appellant was the individual who caused the death of the deceased and that the person the appellant referred to in his confession was in fact Francis Willingham, the deceased. Cf. *Richardson v. State*, 600 S.W.2d 818 (Tex. Cr.App.1980).

Appellant's ground of error that the evidence is insufficient to sustain the verdict of the jury finding him guilty of capital murder is overruled.

We will next address the appellant's fourth ground of error that goes to his claim that his handwritten confession, as well as the transcription of the tape recorded interview that was conducted by Fonte-

not, should not have been admitted into evidence. We will sustain this ground of error.

■■■■ The record reflects that pursuant to the appellant's motion to suppress his handwritten confession and the transcription of the tape recorded interview session, the latter occurring almost immediately after the giving of the handwritten confession to Fontenot, the trial judge conducted a "Jackson v. Denno hearing," so named after the now famous Supreme Court case of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), in which the Supreme Court held that a confession or admission of an accused cannot be used as evidence against him until the trial judge has made a determination at a separate hearing held out of the jury's presence that the confession or admission was voluntarily made. Also see Art. 38.22, V.A.C.C.P. The test at the "Jackson v. Denno" hearing is not whether the evidence is rebutted, but, instead, is whether it is controverted. *Moore v. State*, 700 S.W.2d 193, 202 (Tex.Cr.App.1985). If the evidence is controverted, the trial judge is the sole trier of the facts at the hearing and an appellate court, such as this Court, is not at liberty to disturb any finding of fact that is supported by the evidence. If the facts adduced at the hearing are controverted as to whether the confession was taken in accordance with the law, then the issue is one of fact to be first determined by the trial judge out of the presence of the jury. *Moore v. State*, supra. Also see *Fierro v. State*, 706 S.W.2d 310, 316 (Tex. Cr.App.1986); *Phillips v. State*, 701 S.W.2d 875, 891 (Tex.Cr.App.1985); *Barney v. State*, 698 S.W.2d 114, 120–121 (Tex.Cr. App.1985). On the other hand, if the facts are uncontroverted, then the determination of whether a confession is voluntary must be based upon an examination of the totality of the circumstances surrounding its acquisition. *Barney v. State*, supra, at 120. In this instance, after the hearing was conducted, the trial judge ruled that the appellant's handwritten confession and the transcription of the tape recorded interview session were voluntarily made and admissible evidence as a matter of law and fact, and dictated his order into the record of this cause. E.g., Art. 38.22, Sec. 6, supra.[6]

Fontenot testified at the hearing that he arrested the appellant at his place of employment on June 29, 1984, pursuant to an "N.C.I.C. wanted" on a charge then pending in North Las Vegas, Nevada for the offense of burglary. See *ante*, footnote 5.

On July 3rd, Fontenot "composed a warrant, an affidavit and warrant of arrest" for the offense of aggravated sexual assault, which is unrelated to this cause, took these documents to a magistrate, who was the trial judge in this cause, who issued a warrant of arrest for the appellant for the unrelated offense. At this time the appellant was still in jail. The warrant of arrest was executed and the appellant was then taken before a magistrate, the trial judge, who gave him the *Miranda* warnings[7] for the offense of aggravated sexual assault.

On July 5th, after again warning the appellant, Fontenot engaged the appellant in conversation about the murder of the deceased. The appellant asked Fontenot "if he could take the statement form up to his jail cell and write [Fontenot] the statement out, and [Fontenot] said, yes, he could." The appellant was then taken to his jail cell, after which Fontenot went and ate lunch, after which Fontenot returned to the appellant's jail cell, asked the appellant if he had finished writing out his statement, and was told that he had and that he had already signed the statement. The record does not reflect that any law enforcement official was present in or near the appellant's jail cell during Fontenot's absence. Fontenot then took the appellant downstairs to his office to review the statement with the appellant, which he did, after which he asked the appellant if he could further question him in order "to clarify

---

6. Also see and compare *Quinn v. State*, 558 S.W.2d 10 (Tex.Cr.App.1977).

7. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the statement." Appellant agreed that this could take place. Fontenot again warned the appellant, after which he questioned the appellant about his statement. Fontenot testified that he did not recall whether he advised or warned the appellant that the session that was ultimately tape recorded was going to be a "continuation" of his giving the written confession or that the session was going to be part of the written confession. After a transcription of the tape recording was made by Fontenot's secretary, which the appellant signed, before which he was again warned by Fontenot, Fontenot destroyed the tape recording, "because we don't have that many tapes, and we needed them." The appellant's handwritten confession and the transcription of the tape recording are attached to this opinion as "Appendix A". Fontenot testified that after this occurred the appellant requested, and was permitted to do so, to telephone his mother, after which he told Fontenot that he did not wish to further speak to Fontenot about the case until he could make personal contact with his mother and brother. Fontenot then took the appellant back to his jail cell. The appellant was thereafter taken before another magistrate who again warned him, this time on the capital murder charge.

Fontenot's testimony reflects that at no time did the appellant ever ask for or request the assistance of counsel. Fontenot admitted that when he was conversing with the appellant the subject of the death penalty was brought up. Based upon the record, we easily infer that it was Fontenot, and not the appellant, who initiated this conversation. Fontenot "told him that if he was convicted of capital murder that there was a chance that he would get the death penalty." Fontenot also testified that "we explained to him about the needle. I was just trying to explain to him what could possibly happen to him." Fontenot admitted that at that time, without a confession from the appellant, he "had no case" against the appellant, and that because of this, "as a professional police offi-

cer serving the people of Smith County," he was going to try to get the appellant to confess to the murder, by informing the appellant "That there had been a murder, that a car like his was seen in the area. That he had been out to that residence in the past. That he knew, you know, where the residence was. He was caught there by a Deputy. That his parole was revoked because of that charge. You know, all of that. Tried to explain to him, that, you know, he was a very, very good suspect in the case," and that "we are going to prove he did it," and then told him that "if he was convicted and sentenced to death" "how he was going to die," but that if he confessed "his chances of not getting the death penalty are increased, and are better." Fontenot also told the appellant that any confession he gave could be used "for and against him." Fontenot admitted that he played the part of the "bad guy police officer" in obtaining the confession from the appellant. Another deputy played the part of the "good guy police officer." [8] However, Fontenot testified that at no time did he tell the appellant that he would not receive the death penalty "in exchange for his statements," or that he would not be charged with a death penalty offense if he gave the statements.

The appellant also testified at the hearing. He admitted that because of his past brushes with the law he was familiar with the *Miranda* warnings. Appellant claimed that his requests for an attorney were ignored. The appellant also testified that he was told that "the only way he could save himself was by making a confession"; that "he was going to get the case"; that the only way he could escape being given the death penalty was to confess; that if he confessed he could not be given the death penalty; was told that the police had his fingerprints from the scene of the murder, which the appellant testified he knew was false because his prints could not have been at the scene because he had not been at the murder scene. The appellant fur-

8. Except for Fontenot's testimony on this point, our reading of the record has yet to reveal any details of this "good-guy, bad-guy" routine that was used in inducing the appellant to confess.

ther testified that everything he wrote down was false. "Q: Anything in that statement true? A: No." He testified that he was able to "put things in the statement that he did" was because "From what I know from being there [inside the residence where the deceased met her untimely death] one time [before], and from what I read, and what they told me down there during the questioning. Showed me pictures." The appellant testified that he was not made aware or warned that the tape recorded session was a mere continuation of the handwritten confession that he had given Fontenot, and that before this conversation took place Fontenot did not give him the *Miranda* warnings.

The appellant also testified that Brunt, the then Sheriff of Smith County, who had previously told him that he "had a death penalty case," which to appellant meant that "I felt like when he said I would get it, I would get it," which occurred when he was not being questioned by Fontenot or other officers, informed him after he gave the confession that "he [the Sheriff] was glad I decided to come clean and got my business straight, because I kept myself from getting the death penalty."

The appellant admitted that when the magistrate warned him about the unrelated offense, which occurred before he wrote out his confession, the magistrate went to great pains to make sure that he understood the warnings. However, but as previously noted, these warnings did not go to the capital murder case, but went to the unrelated aggravated sexual assault case. The record clearly reflects that the appellant was never taken before a magistrate before he gave his handwritten confession and had the tape recorded interview session with Fontenot concerning the offense at Bar.

The appellant also testified that he told the officers before he went before the magistrate that he wanted an attorney, but admitted that when he went before the magistrate on the unrelated offense charge he did not inform the magistrate that he wanted an attorney.

The appellant admitted that he was not beaten or threatened with any personal injury by anyone.

In summary, the appellant testified at the hearing that the only reason he wrote out his confession and consented to the tape recorded interview session with Fontenot was because he was led to believe that if he cooperated with the authorities, and told them what he thought they wanted to read and hear, that he would not be subjected to the death penalty, and, by taking these steps he hoped "that would be the end of it."

The appellant asserts that he should have been rewarned by Fontenot before he commenced the tape recorded interview with the appellant. We disagree. Neither our constitutional nor statutory law requires that a defendant be rewarned when there is a transition from questioning him regarding one offense to questioning him regarding another offense, nor have we found any requirement in our law that the *Miranda* warnings must be limited to any specific unlawful conduct, nor do we know of any reason which requires that it be so limited, considering the purpose of the *Miranda* rule. Cf. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Michigan v. Mosely*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). If a rewarning is not required where the defendant is in custody on suspicion for committing one offense but confesses to an unrelated offense, it stands to reason that a rewarning is not required where the interrogation is only a continuation about the same offense.

In this instance, the record clearly reflects that prior to when Fontenot commenced questioning the appellant regarding the offense at Bar, not only had a magistrate given the *Miranda* warnings to the appellant but Fontenot himself gave the appellant the *Miranda* warnings, although the warnings were not limited to any specific unlawful conduct. Soon thereafter, the appellant, while alone, wrote out his confession, after which he was again warned by Fontenot. Subsequently, appel-

lant had the conversation with Fontenot that was tape recorded and later transcribed, which transcription the appellant signed. Another *Miranda* warning appears at the top of the first page of the transcription. The facts clearly reflect that there was a continuity of interrogation that pertained to the same offense after the warnings were given. Even if we agreed with appellant that Fontenot did not rewarn him before he had the tape recorded conversation, which we do not, his contention that Fontenot should have rewarned him would still be without merit. See *supra.*

In his fourth ground of error, the appellant inartfully asserts and argues that the trial judge erred by admitting his handwritten confession and the transcription of the tape recorded interview session into evidence.

We now turn our attention to the "Jackson v. Denno" hearing that was conducted in this cause. First, a few introductory comments.

It has long been the rule in the Supreme Court of the United States and in this Court that it is only when there is undisputed evidence which would render the confession inadmissible that the same becomes inadmissible as a matter of law at the accused's trial. See *Williams v. State,* 298 S.W.2d 590 (Tex.Cr.App.1957).

It has also long been the rule in this Court that when an issue of fact is raised during the trial regarding the validity of a confession, it is then for the jury to resolve those controverted issues. *Glover v. State,* 142 Tex.Cr.R. 592, 152 S.W.2d 747 (1941).

However, if the facts adduced at the "Jackson v. Denno" hearing are uncontroverted on a factual issue that would render the defendant's confession inadmissible as a matter of law, then, as far as the admissibility of the confession goes, that ends the matter because the issue should never have been before the jury in the first place, i.e., there is nothing for the jury to resolve or decide as to the admissiblity of the confession in that instance.

In this instance, an undisputed, uncontroverted, and uncontradicted fact was developed at the hearing. In response to questioning by defense counsel, Fontenot testified that in addition to the other "persuasion" tactics that he used to induce the appellant to confess, he told the appellant that if he confessed his confession "could be used for and against him."

In making his findings of fact on this point, the trial judge made the following statements: "In listening to questioning personally of the witness Fontenot, the Court has heard the statement of Detective Fontenot that he told Thomas Lennon Dunn that the statement could be used for or [sic] against him. And I believe that in the context in which the statement was made, that he was—that he did not mean to say, *and did not say that he used those words,* but I believe that Detective Fontenot did tell Thomas Lennon Dunn that, in his opinion, his chances of getting the death penalty were less if he confessed, or were better of not getting the death penalty, I think; let's put it as it was phrased. And I have very little doubt that it was probably phrased both ways in the course of the interrogation...." (Emphasis added.) Given the record, the trial judge's finding that Fontenot did not tell the appellant that his confession could be used "for or [sic] against him" is clearly erroneous.

The record reflects the following:

Q [Defense Attorney]: And you want him—you not only want him to, you know that it's an absolute essential for you to make this case for him to confess; you have already said that, but you—.

A [Fontenot]: Yes, sir.

. . . . .

Q: I guess what I'm asking, Detective Fontenot, is that you know he has got to confess.

A: Uh-huh.

Q: You believe that he did it?

A: Yes, sir.

Q: You are doing everything in your power, I take it, to get him to confess?

A: Within my rights, yes, sir.

Q: You are doing everything in your power?

A: Yes, sir.

Q: To get him to confess. And you are sitting there telling him, if you open your mouth and confess, you are going to die?

A: No.

Q: Or, did you say, Mr. Dunn, if you get your business straight, you and I both know what that means?

A: Uh-huh.

Q: Mr. Dunn would know what that phrase meant?

A: I would assume so.

Q: That meant—what does that mean?

A: That if you want to fess up to it, write down a confession to it.

Q: If you get your business straight, what? What did you tell him?

A: That he would stand a better chance.

Q: Stand a better chance of what?

A: Of not getting the death penalty, perhaps.

Q: Okay. So, you told Mr. Dunn, and lead Mr. Dunn to believe that he makes a case for you, if he confesses to the case, that his chances of not getting the death penalty are increased, and are better?

A: That's true.

Q: You told him that too, didn't you?

A: Yes, sir.

Q: Okay, I guess what you are saying, Detective Fontenot, is that this statement could be used for and against him?

A: It could.

Q: Did you tell him that?

A: Yes, sir.

Q: Okay. And I assume you told him that, Detective Fontenot, because—.

. . . . .

Q: I take it that you told him that because, number one, you were so convinced, as you are right now, that he was guilty and responsible for a horrible crime, and you knew that you didn't have any physical evidence, that a conviction of this case, and your impression of what justice ought to occur, and ought to be, was dependent upon your ability of being able to get a confession from this man right here?

A: Yes, sir.

Q: Okay. And the things that you did, and you have told us about, and that you have just said, are, at least in part, the things that you used, the techniques that you used, to get him to do that, to see that in your mind that justice got done, and is done; right?

A: That's right.

Q: Okay. Now, when you made the statement to him, Detective Fontenot, that his chances of getting the death penalty—his chances of not getting the death penalty were increased, if he were to give you a confession, the back side of that, the flip side of that statement are pretty obvious, aren't they?

A: I don't understand exactly what you mean.

Q: Well, the back side of that statement is, if you don't give us a confession, you are going to get the death penalty; that's the flip of that, isn't it?

A: Not necessarily, but his chances to me would appear to be greater.

Q: Did you share that with him?

A: Yes, sir. yes, sir.

Q: You told him that?

A: Yes, sir.

Q: Okay. And you did say, I take it, just like you have told us, to induce him or cause him in his thought processes, Mr. Dunn, for him to believe, either rightly or wrongly, from his standpoint, hey, I better give Detective Fontenot a statement? That's what you wanted him to believe?

A: Yes, sir.

Q: Okay. That's the way it's done, isn't it?

A: Yes, sir.

Q: In getting an individual who is charged with a crime to give a confession, to acknowledge his guilt, that's some of the techniques that you use to get him to do that?

A: Yes sir.

. . . . .

For over one hundred years this Court has held that if the evidence is uncontroverted and uncontradicted that the person who takes or obtains a written confession from the accused tells the accused that his confession might be used "for or against him", or "for and against him," then this renders the confession inadmissible evidence at trial because the warning does not comply with our State confession statute, which is presently Art. 38.22, V.A. C.C.P., and such may not be admitted into evidence at trial over objection. One of the conditions precedent to the admission into evidence of an accused's written confession under the statute is that he must be warned by the person to whom the confession was made "that any statement made may be used against him on his trial for the offense concerning which the confession is therein made." This Court has also long held that the warning must be given in strict compliance with the statute. It appears that the majority of this Court's decisions have subscribed to a per se rule of inadmissibility if the evidence was uncontroverted that the officer told the accused that his confession could be used "for or against him," and the accused did not testify at his trial and cure the error. "If the officer who had appellant under arrest warned him that any statement which he (appellant) might make could be used for or against him, it did not meet the requirements of Art. 727, C.C.P. [now Art. 38.22, supra], relating to confessions, and therefore the same was inadmisible in evidence." *Conn v. State*, 140 Tex.Cr.R. 202, 143 S.W.2d 1036, 1037 (1940). Also see *Mc Cain v. State*, 139 Tex.Cr.R. 539, 141 S.W.2d 613 (1940) (On original submission), in which this Court's holding that the confession in that cause was inadmissible because of the "for or against" prohibition was later interpreted by this Court in *Oglesby v. State*, 148 Tex.Cr.R. 393, 187 S.W.2d 555 (1945), to mean that "if it be stated therein that same might be used for the maker ... such deviation from the statutory warning would be fatal to its introduction." (557). Furthermore, in *Mc Caine v. State*, 152 Tex.Cr.R. 108, 211 S.W.2d 190 (1948), this Court held that "compliance with the foregoing provision of the statute is indispensable." (Citations omitted.) (192).

The basis for the per se rule of inadmissibility is that if the accused is advised that his confession may be used "for or against him," or "for and against him," such is an improper warning and, without more, renders the confession inadmissible as a matter of law because to warn the accused that his confession might be used for him holds out an inducement for making the confession. Thus, a warning that it might be used both for him as well as against him causes the confession to be "uttered to bring temporal good as well as to avert temporal evil," which is impermissible. *Mc Veigh v. State,* 62 S.W. 757 (Tex.Cr. App.1901). Thus, if the accused is induced to give a confession to bring about "temporal good" or to "avert temporal evil," then this renders his confession involuntary as a matter of law. Also see *Guinn v. State,* 45 S.W. 694 (Tex.Cr.App.1898); *Unsell v. State,* 45 S.W. 1022 (Tex.Cr.App.1898); *Guinn v. State,* 50 S.W. 350 (Tex.Cr.App. 1899); *Pryor v. State,* 51 S.W. 375 (Tex.Cr. App.1899); *Perry v. State,* 61 S.W. 400 (Tex.Cr.App.1901); *Mc Veigh v. State,* 62 S.W. 757 (Tex.Cr.App.1901); *Hill v. State,* 70 S.W. 754 (Tex.Cr.App.1902); *Glover v. State,* 76 S.W. 465 (Tex.Cr.App.1903); *Adams v. State,* 86 S.W.2d 334 (Tex.Cr.App. 1905); *Stewart v. State,* 124 Tex.Cr.R. 782, 64 S.W.2d 782 (1933); *Reese v. State,* 142 Tex.Cr.R. 254, 151 S.W.2d 828 (1941); *White v. State,* 163 Tex.Cr.R. 77, 289 S.W.2d 279 (1956); *Burton v. State,* 505 S.W.2d 811 (Tex.Cr.App.1974). Cf. *Oglesby v. State,* 148 Tex.Cr.R. 393, 187 S.W.2d 555 (1945); *Walker v. State,* 470 S.W.2d 669 (Tex.Cr.App.1971).

The transcription of the "*Jackson v. Denno*" hearing clearly reflects that prior to obtaining the appellant's confession Fontenot was fully aware that without a confession from the appellant he did not have a capital murder case against the appellant. Realizing this, it is obviously clear, as he said, that he did everything within his pow-

er to get the appellant to confess, including telling him that if he gave a confession it could be used "for and against him." As a matter of law, Fontenot's improper warning caused the confession to become inadmissible evidence at appellant's trial.

Counsel clearly brought his complaint home to the trial judge when he made his arguments to the trial judge after the hearing had concluded. Counsel argued to the trial judge, inter alia: "Now, I have been practicing law twenty years, Judge, and I have never seen, and I was suprised when Detective Fontenot got on that stand and made the admissions that he did in front of this Court. He said that he told this man that that confession could be used for or [sic] against him. That is in direct violation of the law. And if the Court will give me two minutes, we can go back into the Judge's Office and find the cases that say that if that's done, that the confessions, quote, are inadmissible, period. And I was floored when he made those admissions to the Court. But that is the state of the record now ..." As previously pointed out, in his findings of fact, the trial judge erroneously found that Fontenot did not make the statement to the appellant that if

he gave a confession it could be used "for or [sic] against him."

In this State, the prosecutorial use of an involuntary confession is not permitted. See *Mitchell v. State*, 458 S.W.2d 630, 633 (Tex.Cr.App.1970). Given the uncontroverted and uncontradicted facts that were adduced at the "Jackson v. Denno" hearing, we find and hold that Fontenot's statement to the appellant that if he gave a confession that it could be used both "for and against him" caused the confession to become involuntary and thus inadmissible evidence at the appellant's trial. We find and hold from a totality of the circumstances that the appellant was induced to confess by the conduct of Detective Fontenot and the admissions by him settle beyond question that the appellant's confession was not a voluntary one. Appellant's fourth ground of error is sustained.

The judgment of the trial court is reversed and the cause is remanded to that court.

ONION, P.J., and TOM G. DAVIS, W.C. DAVIS, CLINTON, McCORMICK, and CAMPBELL, JJ., concur in result.

WHITE, J., not participating.

## APPENDIX A

STATEMENT OF _Thomas Lennon Dunn_

DATE: _July - 5 - 1984_ . TIME STARTED: _12:00 Noon_ .

LOCATION: _Smith County Sheriff Office_ .

MY NAME IS _Thomas Lennon Dunn_ . MY DATE OF BIRTH

IS _8-31-51_ . I HAVE BEEN WARNED

BY _Det Buck Tennott_ , THE PERSON TO WHOM I AM

MAKING THIS STATEMENT THAT:

_TD_ 1. I have the right to remain silent and not make any statement at all, and any statement I make may be used against me at my trial;

_TD_ 2. Any statement I make may be used as evidence against me in court;

_TD_ 3. I have the right to have a lawyer present to advise me prior to and during any questioning;

_TD_ 4. If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning;

_TD_ 5. I have the right to terminate the interview at any time.

_TD_ I understand each of these rights. I know that I do not have to make this statement, and that I can end the interview at any time. I want to make this statement at this time even though I know and understand that it can be used against me in court. I do not wish to have a lawyer, either hired or appointed, present to advise me before or during any questioning. No one has promised me anything to get me to give up any of my rights or to make this statement. This Waiver of my Rights is completely voluntary on my part.

ON June 27, 1984, I, Thomas Lennon Dunn, went out on State Park Highway to see a lady that I had been seeing before (a few years earlier). She told me that this would be the last visit that I would be welcome and that if I came back she would call the police. We argued for awhile and she told me to finish my business and leave. She told me that if I came back she would throw hot water on me. We began to wrestle and she was trying to scratch me in the face and I hit her and knocked her down. She said she was going to call the law and tell them I raped her. I stomped her three or four times and hit her once or twice more without realizing that I was hitting her that hard.

WITNESS _Det Buck Tennott_ SIGNATURE _Thomas Dunn_

WITNESS _Det Larry Richards_

STATE'S EXHIBIT 2

DA Form 19: Rev. 9/77

344

Afterwards, I Realized that she was Really hurt I tried to make it look like someone had broken in by knocking out the patio door glass and taking her purse. Before I left I went back to the bedroom and put a pillow over her face. She did not seem to be breathing but I don't know. I left her like that and tore her clothes before I left the house. It was not my intention to kill, injure or otherwise do harm to her or anyone else.

WITNESS _____

SIGNATURE _____

WITNESS _____

STATEMENT OF THOMAS LENNON DUNN

DATE: July 5th, 1984 . TIME STARTED: 1:20PM .

LOCATION: _____.

MY NAME IS ·Thomas Lennon Dunn . MY DATE OF BIRTH

IS 08-31-51 _____. I HAVE BEEN WARNED

BY Detective Buck Fontenot _____, THE PERSON TO WHOM I AM

MAKING THIS STATEMENT THAT:

1. I have the right to remain silent and not make any statement at all, and any statement I make may be used against me at my trial;

2. Any statement I make may be used as evidence against me in court;

3. I have the right to have a lawyer present to advise me prior to and during any questioning;

4. If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning;

5. I have the right to terminate the interview at any time.

 I understand each of these rights. I know that I do not have to make this statement, and that I can end the interview at any time. I want to make this statement at this time even though I know and understand that it can be used against me in court. I do not wish to have a lawyer, either hired or appointed, present to advise me before or during any questioning. No one has promised me anything to get me to give up any of my rights or to make this statement. This Waiver of my Rights is completely voluntary on my part.

C#85-5724/Time 1:20PM Interview of Thomas Lennon Dunn, conducted by Detectiv Buck Fontenot.

DETECTIVE BUCK FONTENOT: Mr. Dunn, I have here in my hand a written stateme: that you have given to me about three minutes prio to this interview being taped. Are you aware that this interview is being taped?

THOMAS LENNON DUNN: Yes I am.

DETECTIVE BUCK FONTENOT: Okay, do you have any objections to this interview being taped?

THOMAS LENNON DUNN: No.

DETECTIVE BUCK FONTENOT: Okay, Mr. Dunn I am going to have to ask you to sp up a little louder.

THOMAS LENNON DUNN: ~~x.~~ OK. T.D.

DETECTIVE BUCK FONTENOT: Okay, what I am going to do Mr. Dunn is read this statement back to you. After I have done so I woul. like· for you to add anything you·wish to your stat ment. Do you. understand all. this?

THOMAS LENNON DUNN: Yes, sir.

DETECTIVE BUCK FONTENOT: Okay, I am. reading from the written statement at t: time. On June 27, 1984, I Thomas Lennon Dunn went on the State Park Highway to see a lady that I had been seeing before a few years earlier. She told m that this would be the last visit that I would be welcome and that if I came back she would call the police. We argued for a while and she told me to

WITNESS _____ SIGNATURE _Thomas Lennon Dunn_

WITNESS _____

STATE'S EXHIBIT 3

BA Form 19: Rev. 9/77

STATEMENT OF Thomas Lennon Dunn PAGE___2

| | |
|---|---|
| DETECTIVE BUCK FONTENOT: | CONTINUED— finish my business and leave. She told me that if came back she would throw hot water on me. We began to wrestle and she was trying to scratch me in the face and I hit her and knocked her down. She said she was going to call the law and tell them I rape her. I stomped her three or four times and hit her once or twice more without realizing that I was hitting her that hard. Afterwards I realized that was really hurt and I tried to make it look like someone had broken in by knocking out the patio do glass and taking her purse. Before I left I went b to the bedroom and put a pillow over her face. She did not seem to be breathing but I didn't know. I left her like that and tore her clothes before I left the house. It was not my intention to kill, injure or otherwise do harm to her or anyone else. Is this all tht you have written down on this statement here? |
| THOMAS LENNON DUNN: | Yes it is. |
| DETECTIVE BUCK FONTENOT: | Mr. Dunn do you have anything else that you would like to add to this statement? |
| THOMAS LENNON DUNN: | Uh, first it wasn't State Park Highway. |
| DETECTIVE BUCK FONTENOT: | Okay, what.... |
| THOMAS LENNON DUNN: | It was Lake Park Drive. |
| DETECTIVE BUCK FONTENOT: | Lake Park Drive. |
| THOMAS LENNON DUNN: | It was my mistake by putting State Park Highway. |
| DETECTIVE BUCK FONTENOT: | Okay. |
| THOMAS LENNON DUNN: | Supplement uh, when uh, I first got there we sat, you know she got like a dining room and a kitchen and she was in the kitchen uh, had a pressure cook on, and then she said let me take this off because it will blow up if I don't turn it off. Then we went to the back bedroom. |
| DETECTIVE BUCK FONTENOT: | Okay, Mr. Dunn, where was your car parked at durin the time all of this was going on? |
| THOMAS LENNON DUNN: | Down the street. I couldn't park at the house, she told me not to park at the house, somebody might see it. |
| DETECTIVE BUCK FONTENOT: | Okay, what car were you driving? |
| THOMAS LENNON DUNN: | A red 1975 Oldsmobile, white vinyl top. |

WITNESS _Det Buck Fontenot_ _Thomas Lennon Dunn_
 SIGNATURE

WITNESS _____

STATEMENT OF ___THOMAS LENNON DUNN_____ . PAGE___2_____

| | |
|---|---|
| DETECTIVE BUCK FONTENOT: | Mr. Dunn you said that you took her purse. Where is that purse at now? |
| THOMAS LENNON DUNN: | I don't know. |
| DETECTIVE BUCK FONTENOT: | Okay, can you tell me exactly what happened to the purse? |
| THOMAS LENNON DUNN: | I threw it at a garbage bin, a dumpster. |
| DETECTIVE BUCK FONTENOT: | Which is where? |
| THOMAS LENNON DUNN: | On my job. |
| DETECTIVE BUCK FONTENOT: | Which is were? |
| THOMAS LENNON DUNN: | Tyler Warehouse. |
| DETECTIVE BUCK FONTENOT: | On Palace? |
| THOMAS LENNON DUNN: | 408 North Palace. |
| DETECTIVE BUCK FONTENOT: | Okay, would you mind telling me what you used to break the glass door? |
| THOMAS LENNON DUNN: | An iron pipe. |
| DETECTIVE BUCK FONTENOT: | Okay, could you tell me where you found this pipe at? |
| THOMAS LENNON DUNN: | Outside, next to the fence, the gate. |
| DETECTIVE BUCK FONTENOT: | Okay, and then after you used it what did you do with it? |
| THOMAS LENNON DUNN: | Put it back. |
| DETECTIVE BUCK FONTENOT: | Back next to the gate? |
| THOMAS LENNON DUNN: | The same place. |
| DETECTIVE BUCK FONTENOT: | Mr. Dunn, can you tell me about what time you arri at her residence? |
| THOMAS LENNON DUNN: | Uh, I guess about 10:15, 10:00. |
| DETECTIVE BUCK FONTENOT: | Okay, about what time did you leave? |
| THOMAS LENNON DUNN: | About, uh, a quarter to eleven, eleven o'clock. |
| DETECTIVE BUCK FONTENOT: | Is there anything else that you would like to add to this statement that I have not ask you? |
| THOMAS LENNON DUNN: | Besides saying I'm sorry, I just wish it had never happened. |
| DETECTIVE BUCK FONTENOT: | No further. End of interview time is now 1:25PM. |

SIGNATURE

WITNESS _____

WITNESS _____